I am authorized to state that Justice McHUGH joins with me in this dissent.

728 S.E.2d 122

**STATE of West Virginia, Plaintiff Below, Respondent**

v.

**Tony Curtis MYERS, Defendant Below, Petitioner.**

No. 11–0497.

Supreme Court of Appeals of West Virginia.

Submitted March 27, 2012.

Decided June 1, 2012.

Scott Driver, Esq., Scott Driver Law, Charleston, WV, Attorney for Petitioner.

Darrell V. McGraw, Jr., Esq., Attorney General, Laura Young, Esq., Assistant Attorney General, Charleston, WV, Attorneys for Respondent.

PER CURIAM:

This case is before this Court upon appeal of a final order of the Circuit Court of Kana-

wha County entered on September 7, 2010.[1] In that order, Tony Curtis Myers (hereinafter "the petitioner") was convicted of three counts of first degree robbery. He was sentenced to three concurrent terms of incarceration of sixty years each. In this appeal, the petitioner asserts that the circuit court erred by: 1) allowing the admission of evidence obtained pursuant to an illegal warrantless arrest, search, and seizure; 2) permitting witnesses called by the State to identify the petitioner despite a prior illegal, suggestive identification procedure; 3) permitting the State to prosecute multiple robbery charges stemming from one occurrence or transaction in violation of double jeopardy principles; and 4) denying his motions for judgment of acquittal or a new trial based upon the insufficiency of the evidence to support his convictions. Based upon the parties' briefs and arguments in this proceeding, as well as the relevant statutory and case law, this Court is of the opinion that the circuit court did not commit reversible error and, accordingly, affirms the decision below.

## I.

### FACTS

On August 29, 2007, at approximately 10:00 p.m., the petitioner robbed an Exxon One Stop convenience store located in Charleston, West Virginia. The petitioner was wearing a green hat, red plaid flannel shirt, dark jeans, and a black bandana that obscured his face. He was also carrying a firearm. There were two store clerks, Tammy Bess and Stephanie Mullins,[2] and two A–1 Cleaning and Restoration employees, Pedro Torres and Mike Price, present when the petitioner robbed the store.[3]

Ms. Bess, the One Stop convenience store manager, testified that the petitioner entered the store and shouted "Everybody get down." Ms. Bess stated that she was ordered to give the petitioner all of the money in the cash registers. She testified that the petitioner said, "Bi*ch, hurry it up. Give me the money. Hurry it up. I'm going to kill you. Hurry up and get me the money." She testified that she gave the petitioner $68 in cash in denominations of five and one dollar bills from one register, but was unable to open the second register.[4] She testified that when she told the petitioner that she could not open the second register, he pointed a gun directly at her head and said, "Get it open or I'm going to kill you." She testified that she complied with the petitioner's demands because she "didn't want to get shot." Ms. Bess was able to activate the store's silent alarm during the robbery.

After completing the robbery of the store, the petitioner turned to Mr. Price and Mr. Torres and ordered them to stand up and empty their pockets. Both men complied with the petitioner's demands. After successfully robbing both men, the petitioner ran to the back door of the store, but then turned around and ran out the front door. The petitioner then ran down an alley. Ms. Bess and Mr. Torres followed the petitioner down the alley. Ms. Bess testified that she ran until she reached the corner of the alley, while Mr. Torres continued to chase the petitioner. Mr. Torres testified that the petitioner had a gun in his hand during the chase.

Joey Shaffer, a mail carrier from the petitioner's neighborhood, who was not in the store during the robbery, joined the pursuit of the petitioner. He testified that he was in the area working on rental property that he owned, heard an alarm, and saw the petitioner being pursued. He said he recognized the petitioner because he had seen him frequent-

---

1. The petitioner was originally sentenced on March 10, 2008. By order entered September 7, 2010, the petitioner was resentenced for purposes of perfecting his appeal.

2. Ms. Mullins was in the store's office and remained hidden during the commission of the crimes.

3. Ms. Bess testified that the store closed one hour early that night because A–1 Cleaning and

Restoration had been hired to "strip and clean" the floors.

4. Ms. Bess knew that the petitioner had taken exactly $68 because the store had just closed and she had counted the money from the registers leaving $75 in each register, $68 in cash and $7 in change. She testified that the petitioner did not take any change.

ly during the seven years he had been delivering mail in the area. He said he watched the petitioner enter the apartment building where he knew the petitioner lived. He explained: "There's a set of stairs on the top right and there's a set on the top left, and the individual went up the one on the top right ... [and] that's 200A Wyoming, which is Tony Myers' apartment."

Soon thereafter, police officers from the Charleston Police Department (CPD) arrived at the scene of the robbery.[5] At trial, Corporal Basford testified that he was advised by Patrolman Hunt and Mr. Shaffer that the petitioner ran down Roane Street westbound and had turned into an alley that intersected with Wyoming Street. Corporal Basford thereafter was directed to an apartment building located at 200 Wyoming Street. He testified that upon arriving at the apartment building, Patrolman Hunt told him the petitioner lived in the top left apartment.

Patrolman Hunt then knocked on an outside door in the front of the apartment building announcing that he was with the CPD. No one answered the door at that time, but Patrolman Hunt could see the silhouette of a person through the window on the second floor of the apartment building. Patrolman Hunt made sure that the area was secure and left the scene to prepare a search warrant. At some point after Patrolman Hunt left the apartment building, Corporal Basford and Detective Randle knocked on the petitioner's apartment door. At trial, Corporal Basford identified the petitioner as the person who opened the door. The police then performed a walkthrough of the apartment to determine if there were any other individuals in the apartment and gathered evidence in the process prior to receiving the search warrant. The petitioner was then arrested, also without a warrant, and taken outside of his apartment where eyewitnesses identified him as the perpetrator of the crime. They also identified articles of clothing taken from the apartment as items worn by the petitioner while he robbed the store.

Thereafter, upon receiving the search warrant from Patrolman Hunt, Patrolman Rinick searched the petitioner's apartment. Patrolman Rinick's search of the petitioner's apartment produced a shirt, pants, latex gloves, $565 in cash, bandanas, and a hat. Patrolman Rinick and Corporal Rollins both testified at trial that there was a piece of paper separating $68 in cash from the rest of the money, which included $45 in five dollar bills and $23 in one dollar bills—the exact amount stolen from the One Stop.

Subsequently, the petitioner was indicted on three counts of first degree robbery in violation of West Virginia Code § 61–2–12(a).[6] On January 25, 2008, the petitioner filed a motion to suppress identification testimony asserting that the on-scene identification conducted at the time of his arrest was overly suggestive. On January 30, 2008, the petitioner also filed a motion to suppress the evidence obtained by the search warrant alleging that because the police had conducted a prior warrantless search in violation of the Fourth Amendment,[7] the search warrant should have been invalidated as the fruit of his illegal arrest and the illegal search of his apartment.

By order dated March 3, 2008, the circuit court found that the petitioner's arrest was an improper, warrantless arrest without exigent circumstances, and therefore, testimony regarding the on-scene identification of the

---

5. All of the officers involved in the investigation of the robbery were with the Charleston Police Department.

6. West Virginia Code § 61–2–12, in part, provides:
   (a) Any person who commits or attempts to commit robbery by:
   (1) Committing violence to the person, including, but not limited to, partial strangulation or suffocation or by striking or beating; or
   (2) uses the threat of deadly force by the presenting of a firearm or other deadly weapon, is guilty of robbery in the first degree and, upon conviction thereof, shall be imprisoned in a state correctional facility not less than ten years.

7. The Fourth Amendment applies to the states through application of the Fourteenth Amendment of the United States Constitution. *Mapp v. Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081, 1090 (1961). Article 3, Section 6 of the West Virginia Constitution is generally construed in harmony with the Fourth Amendment of the United States Constitution. *State v. Duvernoy,* 156 W.Va. 578, 195 S.E.2d 631 (1973).

244

petitioner at his apartment would not be permitted. The circuit court further ruled, however, that the in-court identification of the petitioner by witness Pedro Torres would be permitted at trial; that the petitioner's flannel shirt was admissible under the doctrine of inevitable discovery; and that other items seized during the second search of the petitioner's apartment pursuant to a search warrant were admissible given the probable cause in the affidavit and complaint for the search warrant.

Following a jury trial, the petitioner was found guilty on March 4, 2008, on all three counts of first degree robbery. By special interrogatory, the jury also found that each robbery had been committed with the use of a firearm. Thereafter, the petitioner filed a motion for judgment of acquittal or a new trial based on insufficiency of the evidence. The circuit court denied the motion. On September 7, 2010, the circuit court sentenced the petitioner to a determinate term of sixty years for each conviction, but ordered the sentences to run concurrently. This appeal followed.

## II.

### STANDARD OF REVIEW

The petitioner sets forth four assignments of alleged error in the trial proceedings that he contends should cause this Court to set aside the jury's verdict. This Court has held that: "Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." Syllabus Point 1, *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995). This Court has also indicated that a circuit court's final order and ultimate disposition are reviewed under the abuse of discretion standard. Syllabus Point 1, *State ex rel. Hechler v. Christian Action Network*, 201 W.Va. 71, 491 S.E.2d 618 (1997). The more specific standards of review applicable to each assignment of error will be incorporated into the discussion below.

## III.

### DISCUSSION

The petitioner presents four assignments of error. Each alleged error will be discussed below.

### A. Introduction of Evidence Following Warrantless Arrest, Search and Seizure

The petitioner argues that the circuit court erred in permitting the State to introduce evidence obtained from his apartment pursuant to and subsequent to an illegal warrantless arrest, search, and seizure. The evidence, which the State contended connected the petitioner to the robbery, included a shirt, pants, latex gloves, $565 in cash, bandanas, and a hat. According to the petitioner, the police had already searched his home and seized the items and simply sought a subsequent warrant as a curative formality after-the-fact. He states that warrantless searches are per se unreasonable under the Fourth Amendment of the United States Constitution and Article III, § 6 of the West Virginia Constitution, subject to only a few specific exceptions. He argues that given the circuit court's finding that there was an improper, warrantless search, the circuit court should not have permitted the introduction at trial of the items taken from his house pursuant to the inevitable discovery rule.

The petitioner maintains that the affiant officer, through his affidavit requesting a search warrant, actively misled the magistrate as to the activities of the other officers on the scene. He maintains that the affiant officer failed to disclose that the petitioner was already in custody at the time of the application for the warrant and that officers had already searched his apartment. He further contends that whether the officer's omissions were intentional or reckless is irrelevant because the magistrate was "hoodwinked" into issuing a warrant after an illegal arrest, search, seizure, and overly suggestive identification had taken place. The petitioner notes that in paragraph two of the affidavit, the affiant officer states:

With information, I approached the door of Tony Myers apartment and knocked several loud times while announcing that I was

the Charleston Police Department. While attempting to investigate the occupants of this apartment I could see a silhouette of a person moving in the window on the second floor of the apartment. The person in the apartment continued to peer out of the side of the window, but refused to open the door. After about a half of an hour Tony Myers answered the door. At that time Tony Myers was identified as the robber by two witnesses. A written statement was obtained from both eye witnesses.

The petitioner asserts that it is clear from the face of the affidavit provided to the magistrate that the affiant officer had full knowledge of what had taken place at the petitioner's apartment yet chose not to provide those details. He contends that the CPD's conduct was so "shockingly reckless" that none of the evidence stemming from his illegal arrest, search, and seizure should have been introduced at trial.

Conversely, the State contends that the admission of the particular evidence was properly decided by the circuit court. At the outset, the State asserts that Patrolman Hunt's affidavit accurately described the events as they occurred. The State points out that the petitioner selectively quoted from one portion of the affidavit, but failed to include the paragraph from Patrolman Hunt's affidavit which explained that his statement was "a result of my personal participation in the investigation of matters referred to in this affidavit and based upon reports made to me by other law enforcement officials." The State argues that it is clear from the affidavit that Patrolman Hunt's statement is based upon his personal knowledge of what happened at the petitioner's apartment in addition to information provided to him by officers *after* he left the scene to obtain the warrant. The State further maintains that it is clear from the Final Police Report that Patrolman Hunt was seeking a search warrant *prior* to the arrest and subsequent search of the petitioner's apartment. In the Final Report, Patrolman Hunt explained:

I notified Metro of my location and situation. Shortly after Ptl. Rinick, Ptl. Whittington, Ptl. Payne, and Cpl. Randall arrived to secure the area, I then went to the front of the apartment building and observed a mail box affixed to the building labeled "Tony Myers 200." I knocked on the door by the mail box several loud times as I announced that I was the Charleston Police. I did not get an answer, but I could see the silhouette of a person moving around in the window above. I then notified my district commander, Cpl. Rollins, and advised him of the situation. Cpl. Rollins advised me to keep the area secure and get a search warrant. I advised the other assisting units of my orders and I left the scene to prepare the search warrant.

As such, the State maintains that Patrolman Hunt's statement was entirely consistent with his personal knowledge of the events as well as how they were explained to him by the officers who remained on the scene. The State argues that the circuit court did not commit error in allowing the contested evidence at trial because the search warrant was valid, the previously discovered evidence was admissible under the inevitable discovery rule, and evidence of the petitioner's arrest and subsequent on-scene identification was not admitted at trial.

In *State v. Lilly*, 194 W.Va. 595, 461 S.E.2d 101 (1995), this Court explained that the standard of review of a circuit court's ruling on a motion to suppress is a two-tier standard:

[W]e first review a circuit court's findings of fact when ruling on a motion to suppress evidence under the clearly erroneous standard. Second, we review *de novo* questions of law and the circuit court's ultimate conclusion as to the constitutionality of the law enforcement action. Under the clearly erroneous standard, a circuit court's decision ordinarily will be affirmed unless it is unsupported by substantial evidence; based on an erroneous interpretation of applicable law; or, in light of the entire record, this Court is left with a firm and definite conviction that a mistake has been made. *See State v. Stuart*, 192 W.Va. 428, 452 S.E.2d 886, 891 (1994). When we review the denial of a motion to suppress, we consider the evidence in the light most

favorable to the prosecution. (Footnotes omitted).

194 W.Va. at 600, 461 S.E.2d at 106. In Syllabus Point 1 of *Lilly*, this Court held:

To successfully challenge the validity of a search warrant on the basis of false information in the warrant affidavit, the defendant must establish by a preponderance of the evidence that the affiant, either knowingly and intentionally or with reckless disregard for the truth, included a false statement therein. The same analysis applies to omissions of fact. The defendant must show that the facts were intentionally omitted or were omitted in reckless disregard of whether their omission made the affidavit misleading.

Moreover, in Syllabus Point 4 of *State v. Flippo*, 212 W.Va. 560, 575 S.E.2d 170 (2002), this Court held that:

To prevail under the inevitable discovery exception to the exclusionary rule, Article III, Section 6 of the West Virginia Constitution requires the State to prove by a preponderance of the evidence: (1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct; (2) that the leads making the discovery inevitable were possessed by the police at the time of the misconduct; and (3) that the police were actively pursuing a lawful alternative line of investigation to seize the evidence prior to the time of the misconduct.

■ As discussed below, a thorough review of the record shows that the petitioner did not meet his burden of showing that "facts were intentionally omitted or were omitted in reckless disregard of whether their omission made the affidavit misleading" as required by *Lilly*. While the petitioner argues that Patrolman Hunt applied for the warrant with full knowledge of what had taken place at the petitioner's home, the petitioner has not offered any evidence to support his claims. As this Court explained in *State Dept. of Health v. Robert Morris N.*, 195 W.Va. 759, 765, 466 S.E.2d 827, 833 (1995), "[a] skeletal 'argument,' really nothing more than an assertion, does not preserve a claim.... Judges are not like pigs,

hunting for truffles buried in briefs." (Citation omitted). Moreover, as this Court held in Syllabus Point 2 of *WV Dept. of Health & Human Resources Employees Federal Credit Union v. Tennant*, 215 W.Va. 387, 599 S.E.2d 810 (2004),

"[a]n appellant must carry the burden of showing error in the judgment of which he complains. This Court will not reverse the judgment of a trial court unless error affirmatively appears from the record. Error will not be presumed, all presumptions being in favor of the correctness of the judgment." Syllabus Point 5, *Morgan v. Price*, 151 W.Va. 158, 150 S.E.2d 897 (1966).

The petitioner also fails regarding his allegation that the third element of *Flippo* was not met due to his contention that the CPD was not "actively pursuing a lawful alternative line of investigation to seize the evidence prior to the time of misconduct." The petitioner's allegation is firmly refuted by the record which shows that Patrolman Hunt left the scene outside of the petitioner's home to obtain a search warrant *prior* to the petitioner's answer of his apartment door, *prior* to his arrest, and *prior* to any "sweep" or search of the petitioner's home. In Patrolman Hunt's "Final Police Report," dated October 15, 2007, he indicated that he responded to the crime and, while en route, was advised that Mr. Price was chasing the petitioner. Patrolman Hunt was later advised that the petitioner had fled to an apartment complex. Patrolman Hunt further indicated in his Final Report that he was at the apartment building when he was advised by mail carrier Joey Shaffer that he believed that the suspect was "Tony Myers." He then stated that he notified "Metro" of his location and, after noting a mailbox labeled "Tony Myers 200," he knocked on the door several times with no answer. Patrolman Hunt explained that he notified Corporal Rollins of the situation and was advised to "keep the area secure and get a search warrant." Patrolman Hunt told the other officers of his orders *and left the scene to obtain the search warrant.* He states that it was not until *after* he left to obtain the warrant that the petitioner answered the door and was apprehended by other officers.

When viewing the evidence in the light most favorable to the prosecution, it is clear that Patrolman Hunt was seeking the search warrant *prior to* the petitioner's arrest and subsequent search. As such, when considering the entire record, this Court must affirm the circuit court's holding that the inevitable discovery rule of *Flippo* was applicable here.

## B. Alleged Suggestive Identification Procedure

The petitioner argues that the out-of-court identification was so tainted that the State's witnesses should have been precluded from identifying him in front of a jury. He asserts that the State should have performed a proper lineup procedure to allow the witnesses an opportunity to identify or reject the petitioner as the person who robbed them. Instead, the petitioner states that the police behaved with a reckless disregard for any notions of constitutionality and "topped off an evening of misconduct by hauling him in front of three frightened, impressionable witnesses for a rubberstamp identification." The petitioner states that "once the seed is sown ... the corruption has by then taken root and any subsequent identifications bear the taint of the State's initial misconduct." The petitioner contends that the circuit court erred by allowing the witnesses subjected to this initial identification procedure to identify him in front of the jury.

Conversely, the State contends that the circuit court properly allowed the in-court identification of the petitioner by the witnesses. The State points out that the circuit court ruled that an in-court identification of the petitioner by witnesses would be allowed because the witnesses had an adequate opportunity to observe the petitioner, they were certain in their identification, and their initial identification of the petitioner was made shortly after observing him rob the One Stop and flee the premises.

In Syllabus Point 3 of *State v. Casdorph*, 159 W.Va. 909, 230 S.E.2d 476 (1976), this Court set forth the procedure for determining whether an out-of-court identification of a defendant is so tainted as to require suppression of an in-court identification. The *Casdorph* Court stated:

> In determining whether an out-of-court identification of a defendant is so tainted as to require suppression of an in-court identification a court must look to the totality of the circumstances and determine whether the identification was reliable, even though the confrontation procedure was suggestive, with due regard given to such factors as the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

In the case at hand, all three witnesses testified regarding the circumstances surrounding their identification of the petitioner. For instance, Ms. Bess testified that she was able to get a good look at the petitioner's face during the robbery.

Q: At any point did you get to look at this person's face?

A: Yes, sir.

Q: How did that happen?

A: When he was hollering and he had the gun like this, his mask kept going, or whatever, the bandana [ ] kept dropping. It dropped down to here. He pushed it back up over his eyes and then pulled it back down, so I seen from here up.

Q: And did you recognize that person?

A: Yes sir.

Q: And how did you recognize that person?

A: I had just seen him in the store. Not often. I mean, it's not, you know.

Q: Enough to know who it was?

A: Enough know—you know, I didn't know him. But yes, to know who he was. Yes.

Q: You didn't know his name or anything about him?

A: No.

Q: But you were certain who it was?

A: Yes, sir.

Q: Is that person in this courtroom?

A: Yes, sir.

Q: Can you identify that person by pointing and telling us what they're wearing?

A: It's the man sitting right there in the white shirt staring at me [and she identified the petitioner].

Mr. Torres also testified that he was able to see the petitioner's face.

Q: Okay. At any point right there did you get a chance to look at this person's face?

A: When he went inside the apartment, yes.

Q: Okay. It was dark outside, so how do you get to see his face?

A: Because when he went up to the apartment and he opened the door, the light was on from the apartment. So since he took everything off, he went to the apartment. When he opened the door without nothing on his face, I recognized him. I saw him, his face, first time.

Q: Okay. And did you also see the shirt that was on that person when they opened the door?

A: Yes.

Q: Is it the same shirt that you saw the person wearing inside the store?

A: Yes.

Q: Is that person in this courtroom?

A: Yes. [Mr. Torres thereafter identified the petitioner].

In addition to the testimony from Ms. Bess and Mr. Torres, local mail carrier Joey Shaffer testified that he was familiar with the petitioner and that he recognized him by his build, the way he dressed, and the way he carried himself. His familiarity stemmed from the fact that he had delivered the mail in the petitioner's neighborhood for more than seven years and had seen him on numerous occasions.

In consideration of the totality of the circumstances, the identification was reliable. The petitioner was not randomly identified at the scene. As demonstrated above, the testimony provided that while the petitioner was wearing a bandana at the time of the robbery to obscure his face, his face became visible when the bandana shifted downward during the robbery. The witnesses tracked him on foot after he fled the scene of the crime and the chase eventually led to the arrest of the petitioner at his own apartment. As such, the witnesses were able to describe the petitioner at the time of the crime with specificity, certainty, and with a degree of attention that demonstrated the reliability of their statements. Moreover, their identifications of the petitioner occurred just moments after the actual robbery. Accordingly, there was no abuse of discretion on the part of the circuit court in allowing the in-court identification of the petitioner by the witnesses.

### C. Double Jeopardy

The petitioner asserts that under *State v. Collins*, 174 W.Va. 767, 329 S.E.2d 839 (1984), he should only have been indicted on one count of robbery. In Syllabus Point 2 of *Collins*, this Court stated that

> [i]t is impossible to conclude from either the common law or W.Va.Code, 61–2–12, that an attempt to rob a store by presenting a firearm and leaving without taking any property can, in light of double jeopardy principles, result in multiple convictions of attempted aggravated robbery for each clerk present in such store.

The petitioner states that in the eyes of the perpetrator, all three victims were, for all intents and purposes, employees of the One Stop, i.e., Ms. Bess, a One Stop clerk, and Mr. Torres and Mr. Price, the cleaning crew contracted by One Stop to clean the premises. The petitioner maintains that a single transaction took place in which three persons working for the One Stop were allegedly robbed at once and that he should have only been indicted and prosecuted for one first degree robbery charge. According to the petitioner, the accumulation of the charges violated his rights against double jeopardy.

Conversely, the State argues that *Collins* is applicable only to *attempted* robberies and to robberies where the business is the only "victim." The State contends that the facts

and circumstances of the robbery in this case are different from the facts and circumstances of *Collins.* Moreover, the State believes that it is irrelevant whether the petitioner believed that victims Mr. Price and Mr. Torres were employees of the One Stop because the fact remains that they were robbed individually. The State points out that after ordering the store manager, Ms. Bess, to put the cash register money into a bag, the petitioner then ordered Mr. Price and Mr. Torres to stand up and empty their pockets, which both men did. The State maintains that under these facts, the holding in *Collins* is inapplicable to the case-at-bar. As such, the State points out that there was no error in charging, trying, and convicting the petitioner on three counts of robbery.

This Court has provided that three separate constitutional protections are contained within the guarantee that no person shall be "subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V; *see* W.Va. Const. art. III, § 5 (providing that "[n]o person shall . . . be twice put in jeopardy of life or liberty for the same offense"). As this Court explained in Syllabus Point 1 of *State v. Gill,* 187 W.Va. 136, 416 S.E.2d 253 (1992),

> [t]he Double Jeopardy Clause of the Fifth Amendment to the United States Constitution consists of three separate constitutional protections. It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense.

In Syllabus Point 2 of *Gill,* this Court further held:

> "The Double Jeopardy Clause in Article III, Section 5 of the West Virginia Constitution, provides immunity from further prosecution where a court having jurisdiction has acquitted the accused. It protects against a second prosecution for the same offense after conviction. It also prohibits multiple punishments for the same offense." Syllabus Point 1, *Conner v. Griffith,* 160 W.Va. 680, 238 S.E.2d 529 (1977).

Like this case, the issue presented in *Gill* was the third component of the double jeop-

ardy clause, i.e., the protection against multiple punishments for the same offense.

In consideration of the record herein, the facts and circumstances of the petitioner's case are clearly distinguishable from *Collins.* In *Collins,* the defendant unsuccessfully attempted to rob the business. More specifically, this Court framed the issue in *Collins* as to whether: "only one count of attempted aggravated robbery could be charged because the property sought to be taken belonged to only one owner, the Village Mart." The petitioner's reliance on *Collins* is misplaced. In fact, in *Collins,* this Court specifically addresses the possibility of the precise circumstance as set forth by the facts of the petitioner's case. In *State ex rel. Lehman v. Strickler,* 174 W.Va. 809, 811, 329 S.E.2d 882, 884 (1985), this Court discussed our holding in *Collins* as follows:

> Recently in Syllabus Point 2 of *State v. Collins,* [174] W.Va. [767], 329 S.E.2d 839 (1984), we held that "an attempt to rob a store by presenting a firearm and leaving without taking any property can[not], in light of double jeopardy principles, result in multiple convictions of attempted aggravated robbery for each clerk present in such store." *In the course of that opinion, we were careful not to foreclose the possibility of multiple punishments where there were several completed robberies, and the property taken belonged to several different victims, instead of a single entity such as a bank or store. Indeed, we recognized the possibility of multiple punishments in those circumstances in footnote 12 where we said that: "[I]f other patrons of a business are also robbed, separate robbery convictions are permissible. See, e.g., Richardson v. State,* 429 N.E.2d 229 (Ind.1981); *State v. Hutchison,* 228 Kan. 279, 615 P.2d 138 (1980); *Morgan v. State,* 220 Tenn. 247, 415 S.W.2d 879 (1967)." [174 W.Va. at 774,] 329 S.E.2d at 846.

(Emphasis added).

The facts of the petitioner's case establish that he robbed the One Stop store through its employee, Ms. Bess, who was the store manager. He then individually robbed Mr.

Price and then Mr. Torres. Both men were ordered at gunpoint to the floor and both men were instructed to empty their pockets. The evidence showed that the petitioner then took their individual personal property and fled the premises. Given these facts, this Court finds no double jeopardy violation. Consequently, the circuit court did not commit error in charging, trying, and convicting the petitioner of three counts of robbery.

### D. Sufficiency of the Evidence

The petitioner argues that there was insufficient evidence to support his convictions and that his motion for judgment of acquittal should have been granted. The petitioner contends that it was impossible to identify him as the robber because the perpetrator's face was covered and the witnesses could only see his eyes and nose. He believes that the most a witness could testify to was that the perpetrator was a black male. The petitioner further maintains that although the witnesses pursued the perpetrator, they either lost him or saw him run into a multiple unit apartment building. Next, the petitioner states that the police retrieved a black male known to live in the apartment building and presented him to the witnesses without investigating the other units. As such, the petitioner believes that viewing this evidence in the light most favorable to the State, it cannot be said that any reasonable person could conclude that a witness could positively identify a masked, hat-wearing person from his eyes and nose or that a witness with a casual familiarity with the petitioner (the mail carrier) could identify him as a man he saw sprinting through alleys without having seen his face.

Conversely, the State maintains that when viewing the evidence in the light most favorable to the prosecution, there was more than sufficient evidence for a rational trier of fact to find the essential elements of the crime proved beyond a reasonable doubt. The State points out that witnesses Ms. Bess and Mr. Torres both testified at trial that the petitioner used a handgun in the commission of the offenses and both specifically identified him as the robber. Moreover, the State contends that these witnesses, along with mail carrier Mr. Shaffer, individually described their chase of the petitioner to his apartment complex. The State then argues that each witness described with specificity the clothing that the petitioner was wearing, including the plaid shirt, bandana, and latex gloves. Then, the State notes that the search of the petitioner's apartment, which was pursuant to a search warrant, resulted in the recovery of bandanas, latex gloves, the plaid shirt, as well as a "wad of cash" that included cash separated by a piece of paper totaling $68, which was identical to the amount stolen from the One Stop.

This Court has explained that a jury's verdict should be respected and affirmed unless there is no evidence upon which verdicts of guilty beyond a reasonable doubt could be based. *See* Syllabus Point 2, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995). Moreover, when a criminal defendant challenges the sufficiency of the evidence, all evidence must be viewed from the prosecutor's "coign of vantage." *See* Syllabus Point 2, *State v. LaRock*, 196 W.Va. 294, 470 S.E.2d 613 (1996).

In Syllabus Point 1 of *Guthrie*, this Court set forth the standard of review for cases making a challenge to the sufficiency of the evidence. This standard is as follows:

The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

Moreover, in Syllabus Point 3 of *Guthrie*, this Court held:

A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The

evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled.

Reviewing the record before this Court "in the light most favorable to the prosecution," it is abundantly clear that "any rational trier of fact could have found the essential elements of the crime[s] proved beyond a reasonable doubt." Syllabus Point 1, *Guthrie*. In that regard, the State presented evidence from which the jury could have reasonably concluded that the petitioner committed three separate robberies. As previously discussed, the State provided eyewitness testimony from three people identifying the petitioner as the individual who committed the three robberies. The State then presented evidence that the petitioner fled to his apartment where he was found by the CPD. Moreover, based upon the evidence presented, a jury could have concluded that the hat, plaid shirt, bandana, and latex gloves recovered from the petitioner's apartment were the same items that he wore during the robbery. Then, jurors could have concluded that the $68.00 in cash found in the petitioner's apartment was the same $68.00 that was stolen from the One Stop. In this case, it is undeniable that the jury was presented with sufficient evidence to support its finding that the petitioner was guilty of the charged offenses beyond a reasonable doubt. Therefore, this Court finds no error.

### IV.

### CONCLUSION

For the reasons stated above, we affirm the order of the Circuit Court of Kanawha County entered on September 7, 2010.

Affirmed.