# STATE OF WEST VIRGINIA
# SUPREME COURT OF APPEALS

**State of West Virginia,**
**Plaintiff Below, Respondent**

**vs.)  No. 19-1162** (Kanawha County 19-F-398)

**William Ellis Bowen, IV,**
**Defendant Below, Petitioner**


# MEMORANDUM DECISION


Petitioner William Ellis Bowen, IV, by counsel Edward L. Bullman, appeals the November 25, 2019, order of the Circuit Court of Kanawha County sentencing him to not less than fifteen years in prison for his conviction of death of a child by a parent, guardian, or custodian by child abuse, under West Virginia Code § 61-8D-2a, and life in prison for his conviction of murder of a child by a parent, guardian, custodian, or other person by refusal to supply medical necessities, in violation of West Virginia Code § 61-8D-2. The State of West Virginia, by counsel Patrick Morrisey and William E. Longwell, responds in support of the circuit court's order.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the order of the circuit court is appropriate under Rule 21 of the Rules of Appellate Procedure.

During the September of 2019 term of court, a Kanawha County grand jury indicted petitioner by superseding indictment for death of a child by a parent, guardian, or custodian by child abuse under West Virginia Code § 61-8D-2a and murder of a child by a parent, guardian, custodian, or other person by refusal to supply medical necessities in violation of West Virginia Code § 61-8D-2. The alleged victim, L.H., was petitioner's girlfriend's infant daughter.

Petitioner's jury trial took place on September 16 and 17, 2019. The State's first witness, C.H., was petitioner's former girlfriend and L.H.'s mother. C.H. explained that she was wearing an orange jumpsuit because she was currently housed in a regional jail awaiting sentencing on her conviction for child neglect resulting in death. C.H. admitted that she had been in a relationship with petitioner from April of 2018 to July of 2018. She further testified that she and petitioner rented a bedroom in a trailer in St. Albans where she, petitioner, and L.H. lived. C.H. stated that

1

petitioner was not L.H.'s father. C.H. further testified that, in total, ten to twelve people lived in the trailer. C.H. testified that petitioner would swaddle L.H. too tightly and then squeeze her too tightly to his chest. C.H. further testified that petitioner would force L.H. to take her bottle by squeezing the formula into her mouth. C.H. claimed that when she spoke to petitioner about this behavior, he told her to "Shut the eff up." C.H. also said that petitioner would lay atop L.H. and, when C.H. complained about it, petitioner said, "shut up or get out." C.H. recounted that petitioner would place his hands on L.H.'s face and tell the infant to "Shut the f--k up." C.H. asserted that she did not agree with this behavior but that she saw no injuries on the child. C.H. testified that the frequency of petitioner's physical interactions with L.H. increased over time. C.H. said that, after L.H. died, she told the police that when petitioner was angry with her, he would take it out on L.H. C.H. admitted that she did not report petitioner because she was scared of him, he was bigger than her, and if she involved law enforcement in any way "there could be trouble for me."

C.H. next testified that on the night of June 23, 2018, petitioner became angry with her as she cut his hair. She said petitioner grabbed the hair clippers, threw them and then told her to pack her things and get out. C.H. left the bedroom at about 2:00 a.m.; however, she left L.H. in the room because she was sleeping on a crib mattress on the floor. C.H. testified that when she left the bedroom, petitioner shut and locked the door from the inside of the bedroom. C.H. said she left the trailer to get cigarettes, came back soon thereafter, and gave petitioner some of the cigarettes, but he refused to let her back into the bedroom. C.H. said that she prepared breakfast in the morning and brought it to the bedroom. She said petitioner took the plate of food, but again, would not let her into the bedroom. C.H. testified that she left the trailer again at about 11:55 a.m. to sell metal at a scrap yard in order to get cash with which to buy baby formula. C.H. claimed that she returned to the trailer around 1:15 or 1:30 p.m., went to the bedroom door, handed petitioner the formula, and said, "I'm going back outside to do a trash run" which, she estimated took about seven minutes. C.H. then returned to the bedroom where she found L.H. but could not awaken her. C.H. said she rolled L.H. over and that L.H. was "dead weight . . . there was no breathing. There was no reaction." C.H. testified that she asked petitioner three times, "What the f--k did you do to my daughter?" C.H. further testified that petitioner just looked down and did not respond. C.H. said L.H. was transported by ambulance to the hospital and that L.H. died forty-eight hours later.

On cross-examination, C.H. admitted that she had a key to the lock on the bedroom door. C.H. also admitted that there were several other adults present whom she could have called on for help if she feared for L.H.'s safety. She acknowledged she did not use the key or ask others for assistance.

Sgt. Jason Powell of the Kanawha County Sheriff's Office testified that, at 2:13 p.m. on June 23, 2018, he was dispatched to a trailer in Saint Albans in response to a caller claiming that L.H., was in cardiac arrest. When Sgt. Powell arrived at the scene, he saw a female who "appeared to be giving breaths to an infant [L.H.]" on a kitchen table. Sgt. Powell said petitioner was present but was not attempting to give any medical aid to C.H.

Det. Jarred Payne of the Kanawha County Sheriff's Office testified that he determined that on June 23, 2018, petitioner was locked in a bedroom of the trailer alone with L.H. for at least eleven hours, from about 2:00 a.m. until about 1:00 p.m.

Allen Mock, M.D., the Chief Medical Examiner for the State of West Virginia, was qualified as an expert in forensic pathology. Dr. Mock performed the autopsy on L.H. and testified that he observed bruising, abrasions, and scratches on L.H.'s body and found that her brain was swollen. Dr. Mock determined that the cause of death was "blunt force injuries of the head after being assaulted by a caretaker or caretakers," the manner of death was homicide, and the injuries inflicted upon L.H. constituted child abuse.

The State's final witness was Dr. Joan Phillips, the co-medical director at the Child Advocacy Center at Charleston Area Medical Center's Women's and Children's Hospital. Dr. Phillips was qualified as an expert in pediatrics and in child abuse and neglect. Dr. Phillips testified that when she examined L.H.'s body she observed bruising on L.H.'s forehead, left upper eyelid, the right lower part of her abdomen, and left upper arm. A CT scan revealed a blood clot behind L.H.'s left eye that caused L.H.'s left eye to protrude. L.H. also had subdural and subarachnoid hemorrhaging-bleeding that "occurred in the brain or on the top of the brain from injury to blood vessels" and brain swelling. Dr. Phillips testified that L.H.'s injuries were consistent with child abuse/impact injuries. Dr. Phillips opined that L.H. was slammed down onto a hard surface or a hard surface was slammed down upon her and that the injuries were inflicted within twelve hours of the CT scan, i.e., sometime after 3:45 a.m. on the day L.H. arrived at the hospital. Dr. Phillips opined that the cause of death was "physical child abuse resulting in death" and that L.H. would not have died if she had received medical attention closer to the time she sustained the injuries.

Thereafter, the State rested. Petitioner exercised his right to remain silent and the defense called no witnesses. Before the case was submitted to the jury, petitioner requested the following instruction on causation:

> You are instructed that one event following occurring [sic] after another event is not by itself evidence of causation. In order to convict the defendant of causing the death of [L.H.] by the malicious and intentional withholding of medical treatment, the State must prove beyond a reasonable doubt that but for the failure to provide medical care by [petitioner], the defendant, [L.H.], a child under his care, custody and control would have survived, not that the child might have survived. You must find that the State has proven beyond a reasonable doubt that but for this delay in seeking treatment, there was a reasonable likelihood that the child would have survived with the early treatment.

The circuit court denied the instruction on the ground that West Virginia law does not require such an instruction. Instead, the court instructed that jury as follows:

> The offense charged in Count Two of the Indictment in this case is Murder of a Child by a Parent, Guardian or Custodian or Other Person by unlawfully, feloniously, maliciously, and intentionally Failing or Refusing to Supply such Child with Necessary Food, Clothing, Shelter or Medical Care. One of two verdicts may be returned by you under the Indictment. They are: [g]uilty [or] (2) not guilty.

3

Murder of a Child by a Parent, Guardian or Custodian or Other Person by Refusal to Supply such Child with Necessary Food, Clothing, Shelter or Medical Care is committed when any parent, guardian, or custodian shall maliciously and intentionally cause the death of a child under his care, custody or control by his failure or refusal to supply such child with necessary food, clothing, shelter or medical care. Again,

"Child" means any person under eighteen years of age not otherwise emancipated by law.

"Custodian means a person over the age of fourteen who has or shares actual physical possession or care and custody of a child on a full-time or temporary basis, regardless of whether such person has been granted custody of the child by any contract, agreement or legal proceeding. "Custodian" shall also include, but not be limited to, the spouse of a parent, guardian or custodian, or a person cohabiting with a parent, guardian or custodian.

The term "malice" as used in these instructions, is used in a technical sense. It may be either express or implied and it includes not only anger, hatred and revenge, but other unjustifiable motives. It may be inferred or implied by you from all of the evidence in this case if you find such inference is reasonable from facts and circumstances in this case which have been proven to your satisfaction beyond a reasonable doubt. It may be inferred from any deliberate and cruel act done by [petitioner] without any reasonable provocation or excuse, however sudden. It is not confined to ill-will toward any one or more particular persons, but malice is every evil design in general; and by it is meant that the facts have been attended by such circumstances as are ordinarily symptoms of a wicked, depraved and malignant spirit, and carry with them the plain indications of a heart, regardless of social duty, fatally bent upon mischief. It is not necessary that malice must have existed for any particular length of time and it may first come into existence at the time of the act or any previous time.

The burden is on the State to prove the guilt of [petitioner] beyond a reasonable doubt and [petitioner] is not required to prove himself innocent. He is presumed by the law to be innocent of this charge and this presumption remains with him throughout the entire trial.

Before [petitioner] can be convicted of Murder of a Child by a Parent, Guardian or Custodian of Other Person by Refusal or Failure to Supply such Child with Necessary Food, Clothing, Shelter or Medical Care, the State of West Virginia must overcome the presumption that [petitioner] is innocent and prove to the satisfaction of the jury beyond a reasonable doubt that:

1. [Petitioner];
2. in Kanawha County, West Virginia,
3. on or about the 23rd day of June, 2018,

4

4. did maliciously and intentionally,
5. cause the death of [L.H.],
6. a child under his care, custody or control,
7. by his failure or refusal to supply [L.H.],
8. with necessary food, clothing, shelter or medical care.

The jury convicted petitioner of both counts of the superseding indictment and recommended mercy on the murder count.

On September 27, 2019, petitioner moved for a new trial and judgment of acquittal. The circuit court heard argument on petitioner's motions on November 25, 2019. By order entered that same day, the circuit court denied petitioner's post-trial motions and sentenced him for his conviction for death of a child by parent, guardian, custodian, or other person by child abuse/child neglect resulting in death under West Virginia Code § 61-8D-2a to fifteen years to life in prison. The court then sentenced petitioner for his conviction for the murder of a child by a parent, guardian, custodian, or other person by refusal to supply medical necessities in violation of West Virginia Code § 61-8D-2 to life in prison with the possibility of parole. The court ordered petitioner's sentences to run consecutively. Finally, the court ordered that, upon his release from prison, petitioner would be subject to a fifty-year period of supervised release.

Petitioner now appeals and raises three assignments of error. Petitioner first argues that the State presented insufficient evidence of malice and intent to prove death of a child by a parent, guardian, or custodian by child abuse under West Virginia Code § 61-8D-2a(a), which provides:

> If any parent, guardian or custodian maliciously and intentionally inflicts upon a child under his or her care, custody or control substantial physical pain, illness or any impairment of physical condition by other than accidental means, thereby causing the death of such child, then such parent, guardian or custodian is guilty of a felony.

Petitioner contends that his acts of anger toward L.H.'s mother were not transferable to L.H. He claims the fact that he swaddled the child too tightly or laid on her do not indicate malice or an attempt to harm the child. Petitioner asserts that, instead, these acts were simply his poor attempts to care for the child. Petitioner cites to C.H.'s testimony that he never left any marks on the child and his actions did not alarm the mother. As for C.H.'s testimony that petitioner "kind of tried to force [L.H.] to take [formula]," petitioner highlights that C.H. said she did not report this act because no injury or harm resulted from it. Petitioner also emphasizes C.H.'s testimony that, although petitioner would get angry with C.H., he did not focus his anger on L.H. Petitioner admits that C.H. told a detective that he would sometimes take his anger out on L.H.; however, petitioner emphasizes that C.H. also said that petitioner never meant to harm L.H. Based on this record, petitioner argues that there was no evidence at trial that he intentionally and maliciously caused harm to L.H.

We disagree and find that the evidence adduced at petitioner's trial was sufficient to prove intent and malice beyond a reasonable doubt.

5

A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court.

Syl. Pt. 3, in part, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995). "[T]he relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt." *Id.*, Syl. Pt. 1, in part. "[A] jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *Id.*, Syl. Pt. 3, in part.

To obtain a lawful conviction under West Virginia Code § 61-8D-2a(a), the State must prove that the defendant "maliciously and intentionally inflict[ed] upon a child under his or her care, custody or control substantial physical pain, illness or any impairment of physical condition by other than accidental means, thereby causing the death of such child[.]" "Malice" and "intent" may be inferred from the nature of the criminal conduct. *See* Syl. Pt. 5, in part, *State v. Jenkins*, 191 W. Va. 87, 443 S.E.2d 244 (1994) (citation omitted) ("malice and intent may be inferred by the jury from the defendant's use of a deadly weapon, under circumstances which the jury does not believe afforded the defendant excuse, justification or provocation for his conduct").

Malice is an essential element of murder either in the first or second degree, and where an intentional homicide by the use of a deadly weapon is admitted, the jury may infer malice, willfulness, and deliberation from the act; and by *legal malice is meant not only such as may exist against the deceased*, but it includes such disposition of the accused as shows a heart regardless of duty and fatally bent on mischief.

*Jenkins*, 191 W. Va. at 92, 443 S.E.2d at 249 (citing Syl. Pt. 5, *State v. Panetta*, 85 W. Va. 212, 101 S.E. 360 (1919)).

Here, the State produced uncontested evidence satisfying the elements of West Virginia Code § 61-8D-2a(a). At trial, both medical experts, Dr. Mock and Dr. Phillips, testified that L.H.'s death was caused by a series of blunt force injuries to L.H.'s head, which were not accidental. The evidence also showed that petitioner was alone with L.H. during the timeframe in which those injuries were inflicted. This evidence supports the conclusion that petitioner inflicted the blunt force injuries upon L.H. that caused, among other things, her brain to swell; her left eye to protrude; and ultimately, her death. The level of brutality necessary to inflict these injuries formed a sufficient basis for the jury to reasonably infer that petitioner acted intentionally and with malice. Thus, we reject this assignment of error.

6

In petitioner's second assignment of error, he argues – in three parts – that the evidence failed to prove the elements of murder of a child by a parent, guardian, or custodian by unlawfully, feloniously, maliciously, and intentionally failing or refusing to supply such child with medical care as alleged in the indictment.

Petitioner first argues that the State failed to prove that he maliciously and intentionally caused the child's death by failing or refusing to provide L.H. with necessary medical care under West Virginia Code § 61-8D-2. Petitioner contends that L.H.'s injuries, and not the lack of medical care, caused her death. Petitioner further contends that there was no evidence that his failure to seek medical treatment for L.H. was motivated by malice or with the intent that L.H. should die. Instead, he argues that the most that can be inferred from his actions is that he was motivated "by fear of getting caught."

Petitioner next argues that the evidence did not prove that he failed to provide medical treatment knowing that such a failure would cause L.H.'s death. Petitioner contends that the opinion evidence – that L.H.'s symptoms were such that a layman would be on notice of the need for immediate medical care – was speculative and against the weight of the evidence. Petitioner highlights that the evidence showed L.H. was conscious and crying for a bottle between 7:30 a.m. and 9:00 a.m. on September 17, 2019. Thus, petitioner claims he was not on notice that L.H. needed immediate medical attention. Petitioner also points to Dr. Mock's testimony that, (1) based on L.H.'s CT scan and autopsy, L.H.'s injuries could have occurred anywhere from twelve to twenty-four hours before she arrived at the hospital, and (2) L.H.'s symptoms could have "been a complex presentation that I am not sure the layperson could have appreciated early on."

Finally, petitioner argues that the State was required to prove beyond a reasonable doubt that, but for petitioner's failure to act, L.H. would have survived but that it failed to do so. Petitioner asserts that, at best, the State could claim only that it was possible that an earlier intervention would have saved L.H. Thus, petitioner concludes that his conviction for murder of a child by failing to seek medical care should be reversed.

We disagree. The evidence against petitioner at trial established beyond a reasonable doubt that he committed murder by a parent, guardian, or custodian by maliciously and intentionally refusing to supply L.H. with medical care. West Virginia Code § 61-8D-2 defines the crime of "[m]urder of a child by a parent, guardian, or custodian or other person by refusal or failure to supply necessities, or by delivery, administration, or ingestion of a controlled substance. . . ." Specifically, § 61-8D-2(a) provides that

> [i]f any parent, guardian or custodian shall maliciously and intentionally cause the death of a child under his or her care, custody or control by his or her failure or refusal to supply such child with necessary food, clothing, shelter or medical care, then such parent, guardian or custodian shall be guilty of murder in the first degree.

Petitioner argues that, at trial, the State presented no evidence of malice or that he intended to cause L.H.'s death by not obtaining medical treatment. However, as noted above, malice and intent may be inferred from the evidence. *See*, *e.g.*, *Panetta*, 85 W. Va. at 212, 101 S.E. at 360, Syl. Pt. 5. For example, in *State v. Fannin*, No. 14-0797, 2015 WL 2364295 (W. Va. May 15,

7

2015)(memorandum decision), this Court rejected a claim that the State failed to prove, under West Virginia Code § 61-8D-2(a), that Mr. Fannin acted with malice and intent when he failed to render or supply medical care to a child. The expert testimony at Mr. Fannin's trial supported the State's claim that the injuries inflicted upon the child were not accidental. *Fannin*, 2015 WL 2364295 at *5. Similarly, in the instant appeal, the evidence showed that L.H.'s injuries were not accidental, that the only person who could have inflicted them was petitioner when he was alone with L.H., and that petitioner never made any effort to supply L.H. with medical care. On these facts, the jury had sufficient evidence to infer that petitioner maliciously and intentionally caused L.H.'s death by failing to supply her medical care after inflicting life threatening injuries. We also reject petitioner's argument that L.H.'s injuries, and not the lack of medical care, caused her death. The evidence at trial clearly showed that L.H.'s injuries led to her death because she was not timely provided with medical care.

Further, the State introduced sufficient evidence at trial to establish that petitioner intentionally failed to provide L.H. medical treatment knowing that such failure would lead to her death. Petitioner contends that "[t]he State failed to prove that [he] would have known that immediate medical attention [for L.H.] was necessary." However, the evidence at trial showed that the nature of L.H.'s injuries was so severe that a reasonable layperson would have known she needed immediate medical care.

Despite this evidence, petitioner argues that the evidence at trial did not support the jury's finding that L.H. would have survived if she had timely received medical care and that the failure to provide medical care led to her death. However, petitioner fails to support this argument given that he fails to include a single citation to the record below or to cite to any West Virginia-based authority in support. Accordingly, petitioner's argument on this point violates Rule 10(c)(7) of the West Virginia Rules of Appellate Procedure regarding "Argument" which provides that a party's

> argument must contain appropriate and specific citations to the record on appeal, including citations that pinpoint when and how the issues in the assignments of error were presented to the lower tribunal. The Court may disregard errors that are not adequately supported by specific references to the record on appeal.

*See*, *e.g.*, Administrative Order, Filings that do not comply with the Rules of Appellate Procedure (December 10, 2012).

> An appellant must carry the burden of showing error in the judgment of which he complains. This Court will not reverse the judgment of a trial court unless error affirmatively appears from the record. Error will not be presumed, all presumptions being in favor of the correctness of the judgment.
>
> *State v. Myers*, 229 W.Va. 238, 241, 728 S.E.2d 122, 130 (2012) (internal quotations and citations omitted).

*State v. Larry A.H.*, 230 W. Va. 709, 716, 742 S.E.2d 125, 132 (2013).

8

In petitioner's third and final assignment of error, he argues that the trial court erred by refusing to approve his proposed jury instruction regarding causation, which was one of the elements of the count of the indictment that charged petitioner with murder of a child by a parent, guardian, custodian, or other person by refusal and failure to supply medical necessities. Petitioner argues that, as a result, the jury was not fully instructed that they had to find that, but for the failure to provide medical care, there was a reasonable likelihood that the child would have survived.

We have held that

> A trial court's instructions to the jury must be a correct statement of the law and supported by the evidence. Jury instructions are reviewed by determining whether the charge, reviewed as a whole, sufficiently instructed the jury so they understood the issues involved and were not mislead by the law. A jury instruction cannot be dissected on appeal; instead, the entire instruction is looked at when determining its accuracy. A trial court, therefore, has broad discretion in formulating its charge to the jury, so long as the charge accurately reflects the law. Deference is given to a trial court's discretion concerning the specific wording of the instruction, and the precise extent and character of any specific instruction will be reviewed only for an abuse of discretion.

*Guthrie*, 194 W. Va. at 663-64, 461 S.E.2d at 169-70, Syl. Pt. 4.

We find that the circuit court did not err in refusing to give petitioner's proposed instruction to the jury for several reasons. Here, the circuit court gave a correct statement of law that was supported by the evidence, *i.e.*, that L.H.'s death was caused by petitioner's failure to provide her with medical care. Second, the circuit court had the discretion to reject petitioner's proposed instruction, which was based on a Nebraska case, *State v. Muro*, 695 N.W.2d 425 (Neb. 2005), and, therefore, was not a correct statement of *West Virginia* law.[1]

---

[1] Neither West Virginia nor any other state has adopted the rule in that case, and *Muro's* facts are distinguishable from those in the instance case. The facts in *State v. Muro*, 695 N.W.2d 425 (Neb. 2005), are these: A mother left an infant with her husband while she ran errands. Upon her return, the mother found that the infant was "dazed" and her eyes were "half open." The husband delayed taking the child to the hospital for four hours. Thereafter, the child died and the father was charged with felony child abuse. At trial, the State introduced sparse evidence that the father's failure to seek medical treatment for the infant caused the infant's death. Specifically, a medical expert testified that "if treatment had been sought immediately, [the infant's] survival was possible, but he could not say it was probable." *Id.* at 431. On appeal, the Supreme Court of Nebraska reversed finding that the evidence was insufficient to prove causation that Mr. Muro's failure to provide medical aid caused the baby's death – explaining that, "[t]he State proved only the *possibility* of survival with earlier treatment. Such proof is insufficient to satisfy even the lesser civil burden of proof by a preponderance of the evidence." *Id.* at 432.

*Muro* is distinguishable from the instant case because, in the instant case, Dr. Phillips testified on direct examination that L.H. would have lived if she had received medical attention

(Continued . . .)

9

Thus, this assignment of error fails.

For the foregoing reason we affirm.

Affirmed.

**ISSUED:** March 31, 2022

**CONCURRED IN BY:**

Chief Justice John A. Hutchison
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice Alan D. Moats sitting by temporary assignment

**DISSENTING:**

Justice William R. Wooton

*Wooton, Justice, dissenting*:

I respectfully dissent, as I believe that under the particular facts and circumstances of this case, petitioner's convictions and consecutive sentences violated article three, section five of the West Virginia Constitution, which provides in pertinent part that "nor shall any person, in any criminal case . . . be twice put in jeopardy of life or liberty for the same offense." In this regard, it is well established that "[t]he Double Jeopardy Clause in Article III, Section 5 of the West Virginia Constitution, provides immunity from further prosecution where a court having jurisdiction has acquitted the accused. It protects against a second prosecution for the same offense after conviction. *It also prohibits multiple punishments for the same offense.*" *State v. Sayre,* 183 W. Va. 376, 379, 395 S.E.2d 799, 802 (1990) (citing Syl. Pt. 1, *Conner v. Griffith*, 160 W. Va. 680, 238 S.E.2d 529 (1977)) (emphasis added).

In a long line of cases, this Court has recognized that the traditional test for

---

soon after her injuries were sustained. On cross-examination, Dr. Phillips more specifically opined that if L.H. had received medical treatment within an hour of her injuries, there was a ninety percent chance that L.H. would have lived. This testimony satisfied the State's burden of proof of causation beyond a reasonable doubt that petitioner's failure to provide L.H. timely medical care was the proximate cause of her death. *See State v. Conrad*, 167 W. Va. 906, 909, 280 S.E.2d 728, 730 (1981).

analyzing a double jeopardy claim, *see Blockburger v. United States*, 284 U.S. 299 (1932),[2] is not controlling where there is a clear indication of legislative intent to create separate and distinct felonies subject to separate punishments. *See State v. Gill*, 187 W. Va. 136, 138, 416 S.E.2d 253, 255 (1992) ("The legislature has clearly and unequivocally declared its intention that sexual abuse involving parents, custodians, or guardians, W. Va. Code, 61-8D-5, is a separate and distinct crime from general sexual offenses, W. Va. Code, 61-8B-1, *et seq*., for purposes of punishment."); *see also State ex rel. Lorenzetti v. Sanders*, 235 W. Va. 353, 364, 774 S.E.2d 19, 30 (2015 ("each purchase of goods or services made using a state purchasing card in a manner contrary to the provisions of the W. Va. Code § 12–3–10a (2007) or rules promulgated pursuant to that section involves a distinct offense."); *State v. McGilton*, 229 W. Va. 554, 566, 729 S.E.2d 876, 888 (2012) (in case involving multiple charges of malicious assault, "the legislature intended for each 'wound' or 'bodily injury' motivated by an intent to 'maim, disfigure, disable or kill' to be the proper unit of prosecution."); *State ex rel. Games-Neely v. Silver*, 226 W. Va. 11, 17, 697 S.E.2d 47, 53 (2010) ("the Legislature intended to impose punishment in addition to that specified for the underlying felony of first degree arson when the felony act of arson also 'causes serious bodily injury which maims, disfigures, or disables any person, but does not result in death.").

I agree with the Court's reasoning in these cases and acknowledge that the rule set forth therein is controlling precedent applicable to most situations.[3] Nonetheless, in this case the majority has taken the proverbial step too far, holding – in practical effect – that the petitioner was properly convicted and sentenced for killing his victim twice.

Count One of the Indictment alleged that petitioner, "being the parent, guardian and custodian of [L.H.] . . . did unlawfully, feloniously, maliciously and intentionally inflict substantial physical pain, illness and any impairment of physical condition, by other than accidental means, **thereby causing the death of the said [L.H.]**, in violation of Chapter 61, Article 8D, Section 2a, West Virginia Code 1931[.]" (Emphasis added). This language

---

[2] "[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not." *Blockburger*, 284 U.S. at 304.

[3] The notable exception is a situation where one crime is a lesser included offense of another. *See*, *e.g*., Syl. Pt. 10, *Flack v. Ballard*, 239 W. Va. 566, 803 S.E.2d 536 (2017) ("'Double jeopardy prohibits an accused charged with felony-murder, as defined by W.Va. Code § 61-2-1 (1977 Replacement Vol.), from being separately tried or punished for both murder and the underlying enumerated felony.' Syllabus Point 8, *State v. Williams*, 172 W.Va. 295, 305 S.E.2d 251 (1983).").

precisely recited the language of the statute under which the crime was charged.[4] Count Two of the Indictment alleged that the petitioner, "being the parent, guardian and custodian of [L.H.] . . . did unlawfully, feloniously, maliciously and intentionally **cause the death of the said [L.H.]** . . . by his failure and refusal to supply such child with necessary food, clothing, shelter and medical care, in violation of Chapter 61, Article 8D, Section 2, West Virginia Code 1931[.]" (Emphasis added). Again, this language precisely recited the language of the statute under which the crime was charged.[5]

Consistent with the allegations set forth in the Indictment, the jury was instructed that in order to find petitioner guilty of the charge contained in Count One, the State was required to

prove to the satisfaction of the jury beyond a reasonable doubt that:
1) The Defendant, WILLIAM ELLIS BOWEN IV,
2) in Kanawha County, West Virginia,
3) on or about the 23rd day of June, 2018
4) did maliciously and intentionally,
5) inflict upon [L.H.],
6) a child under his care, custody or control,
7) substantial physical pain or impairment of physical condition,
8) by other than accidental means,
9) **causing the death of [L.H.]**.

The jury was further instructed that in order to find the petitioner guilty of the charge contained in Count Two, the State was required to

---

[4] West Virginia Code § 61-8D-2a(a) provides that

> [i]f any parent, guardian or custodian maliciously and intentionally inflicts upon a child under his or her care, custody or control substantial physical pain, illness or any impairment of physical condition by other than accidental means, thereby causing the death of such child, then such parent, guardian or custodian is guilty of a felony.

[5] West Virginia Code § 61-8D-2(a) provides that

> [i]f any parent, guardian or custodian shall maliciously and intentionally cause the death of a child under his or her care, custody or control by his or her failure or refusal to supply such child with necessary food, clothing, shelter or medical care, then such parent, guardian or custodian shall be guilty of murder in the first degree.

12

prove to the satisfaction of the jury beyond a reasonable doubt that:
1)  The Defendant, WILLIAM ELLIS BOWEN IV,
2)  in Kanawha County, West Virginia
3)  On or about the 23rd day of June, 2018,
4)  Did maliciously and intentionally,
5)  **Cause the death of [L.H.]**,
6)  A child under his care, custody or control,
7)  By his failure or refusal to supply [L.H.],
8)  With necessary food, clothing, shelter or medical care.

The jury found petitioner guilty on both counts of the Indictment, thus finding beyond a reasonable doubt that he (1) caused the death of the child by "inflict[ing] substantial physical pain, illness and any impairment of physical condition, by other than accidental means," and (2) caused the death of the child by "his failure and refusal to supply such child with . . . medical care." At sentencing, the court imposed sentences of fifteen years to life for petitioner's conviction on Count One and life with mercy[6] for petitioner's conviction on Count Two, directing that the sentences would run consecutively.

The problem in this case is readily apparent: although the evidence at trial was more than sufficient to establish both that petitioner inflicted substantial physical injuries on the child and that he failed to obtain medical care for her in a timely fashion, only one of these heinous acts could be found beyond a reasonable doubt to be the cause of death. In short, petitioner could not constitutionally be tried, convicted, and sentenced on multiple charges of murdering L.H., which is exactly what happened in this case.

I have no sympathy for petitioner, whose treatment of an innocent baby was callous and cruel. However, in its zeal to maximize the possible punishment for petitioner's crimes, the State crossed a constitutional line and "twice put [petitioner] in jeopardy of life or liberty for the same offense."

For the foregoing reasons, I respectfully, and regretfully, dissent.

---

[6] The jury had added a recommendation of mercy to its verdict.