IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2017 Term

**FILED**
**November 2, 2017**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 16-0914

STATE OF WEST VIRGINIA,
Plaintiff Below, Respondent

v.

RYAN L. HENSON,
Defendant Below, Petitioner

Appeal from the Circuit Court of Berkeley County
The Honorable Gray Silver, III, Judge
Criminal Action No. 16-F-11

REVERSED, IN PART, AND REMANDED WITH INSTRUCTIONS;
AFFIRMED, IN PART

AND

No. 16-0888

STATE OF WEST VIRGINIA,
Plaintiff Below, Respondent

v.

KERRI S. REIGH,

Defendant Below, Petitioner

---

Appeal from the Circuit Court of Berkeley County
The Honorable Gray Silver, III, Judge
Criminal Action No. 16-F-20

REVERSED, IN PART, AND REMANDED WITH INSTRUCTIONS;
AFFIRMED, IN PART

---

AND

---

No. 16-0850

---

STATE OF WEST VIRGINIA,
Plaintiff Below, Respondent

v.

JONATHAN W. PHYSIOC,
Defendant Below, Petitioner

---

Appeal from the Circuit Court of Berkeley County
The Honorable Gray Silver, III, Judge
Criminal Action No. 16-F-14

REVERSED, IN PART, AND REMANDED WITH INSTRUCTIONS;
AFFIRMED, IN PART

Submitted:  September 20, 2017
Filed:  November 2, 2017

Michael J. Sharley, Esq.
Westover, West Virginia
Counsel for the Petitioner
Ryan L. Henson

Douglas F. Kobayashi, Esq.
KOBY LAW
Martinsburg, West Virginia
Counsel for the Petitioner
Kerri S. Reigh

Lisa A. Green, Esq.
LAW OFFICE OF LISA A. GREEN
Shepherdstown, West Virginia
Counsel for the Petitioner
Jonathan W. Physioc

Patrick Morrisey, Esq
Attorney General
Robert L. Hogan, Esq.
Deputy Attorney General
Counsel for the Respondent

JUSTICE WORKMAN delivered the Opinion of the Court.

**SYLLABUS BY THE COURT**

1. "The purpose of the Double Jeopardy Clause is to ensure that sentencing courts do not exceed, by the device of multiple punishments, the limits prescribed by the legislative branch of government, in which lies the substantive power to define crimes and prescribe punishments." Syl. Pt. 3, *State v. Sears*, 196 W. Va. 71, 468 S.E.2d 324 (1996).

2. "The analysis of whether a criminal defendant may be separately convicted and punished for multiple violations of a single statutory provision turns upon the legislatively-intended unit of prosecution." Syl. Pt. 4, *State v. Goins*, 231 W. Va. 617, 748 S.E.2d 813 (2013).

3. "'At common law, the definition of robbery was (1) the unlawful taking and carrying away, (2) of money or goods, (3) from the person of another or in his presence, (4) by force or putting him in fear, (5) with intent to steal the money or goods.' Syllabus Point 1, *State v. Harless*, 168 W. Va. 707, 285 S.E.2d 461 (1981)." Syl. Pt. 3, *State v. Neider*, 170 W. Va. 662, 295 S.E.2d 902 (1982).

4. "It is impossible to conclude from either the common law or W. Va. Code, 61-2-12, that an attempt to rob a store by presenting a firearm and leaving without taking any property can, in light of double jeopardy principles, result in multiple convictions

i

of attempted aggravated robbery for each clerk present in such store." Syl. Pt. 2, *State v. Collins*, 174 W. Va. 767, 329 S.E.2d 839 (1984).

5.     "The action of a trial court in admitting or excluding evidence in the exercise of its discretion will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion." Syl. Pt. 10, *State v. Huffman*, 141 W. Va. 55, 87 S.E.2d 541 (1955), *overruled on other grounds by State ex rel. R.L. v. Bedell*, 192 W. Va. 435, 452 S.E.2d 893 (1994).

6.     "Under Rule 801(d)(2)(E) of the West Virginia Rules of Evidence, a declaration of a conspirator, made subsequent to the actual commission of the crime, may be admissible against any co-conspirator if it was made while the conspirators were still concerned with the concealment of their criminal conduct or their identity." Syl. Pt. 3, *State v. Helmick*, 201 W. Va. 163, 495 S.E.2d 262 (1997).

7.     "Under the Confrontation Clause . . . a testimonial statement is, generally, a statement that is made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Syl. Pt. 8, in part, *State v. Mechling*, 219 W. Va. 366, 633 S.E.2d 311 (2006).

8.     "The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt." Syl. Pt. 1, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995).

9.     "A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled." Syl. Pt. 3, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995).

10. "When a criminal defendant undertakes a sufficiency challenge, all the evidence, direct and circumstantial, must be viewed from the prosecutor's coign of vantage, and the viewer must accept all reasonable inferences from it that are consistent with the verdict. This rule requires the trial court judge to resolve all evidentiary conflicts and credibility questions in the prosecution's favor; moreover, as among competing inferences of which two or more are plausible, the judge must choose the inference that best fits the prosecution's theory of guilt." Syl. Pt. 2, *State v. LaRock*, 196 W. Va. 294, 470 S.E.2d 613 (1996).

11. "As a general rule, the refusal to give a requested jury instruction is reviewed for an abuse of discretion. By contrast, the question of whether a jury was properly instructed is a question of law, and the review is *de novo*." Syl. Pt. 1*, State v. Hinkle*, 200 W. Va. 280, 489 S.E.2d 257 (1996).

12. "Instructions must be based upon the evidence and an instruction which is not supported by evidence should not be given." Syl. Pt. 4, *State v. Collins*, 154 W. Va. 771, 180 S.E.2d 54 (1971).

13. "'A trial court's refusal to give a requested instruction is reversible error only if: (1) the instruction is a correct statement of the law; (2) it is not substantially covered

in the charge actually given to the jury; and (3) it concerns an important point in the trial so that the failure to give it seriously impairs a defendant's ability to effectively present a given defense.' Syl. Pt. 11, *State v. Derr*, 192 W.Va. 165, 451 S.E.2d 731 (1994)." Syl. Pt. 13, *State v. Surbaugh*, 237 W. Va. 242, 786 S.E.2d 601 (2016).

14. "When the State had or should have had evidence requested by a criminal defendant but the evidence no longer exists when the defendant seeks its production, a trial court must determine (1) whether the requested material, if in the possession of the State at the time of the defendant's request for it, would have been subject to disclosure under either West Virginia Rule of Criminal Procedure 16 or case law; (2) whether the State had a duty to preserve the material; and (3) if the State did have a duty to preserve the material, whether the duty was breached and what consequences should flow from the breach. In determining what consequences should flow from the State's breach of its duty to preserve evidence, a trial court should consider (1) the degree of negligence or bad faith involved; (2) the importance of the missing evidence considering the probative value and reliability of secondary or substitute evidence that remains available; and (3) the sufficiency of the other evidence produced at the trial to sustain the conviction." Syl. Pt. 2, *State v. Osakalumi*, 194 W. Va. 758, 461 S.E.2d 504 (1995).

Workman, Justice:

Before the Court are the consolidated appeals of the three Petitioners, Ryan L. Henson ("Petitioner Henson"), Kerri S. Reigh ("Petitioner Reigh"), and Jonathon W. Physioc ("Petitioner Physioc") (also collectively referred to as "the Petitioners"), who were tried together before a jury. Each was convicted[1] on charges of one count of burglary, three counts of robbery in the first degree, three counts of assault during the commission of a felony, and one count of conspiracy and sentenced.[2]

Several issues are raised by the Petitioners, but the main issue the Court must decide is whether double jeopardy principles were violated by the Petitioners' respective convictions for three counts of robbery in the first degree.[3] Based upon our review of the parties' briefs and arguments, we find that under our law, the Petitioners should have been indicted, tried and convicted on only a single count of robbery in the first degree. The Court,

[1]Petitioner Reigh's conviction was due to the jury finding that she acted as a principal in the second degree.

[2]Based on the jury convictions, Petitioner Henson was sentenced to one to fifteen years for burglary; eighty years for each of the three counts of robbery in the first degree, to run concurrently with each other; two to ten years for each count of assault during the commission of a felony; and one to five years for conspiracy, with all the counts, other than for the robberies, to be served consecutively to each other and to the robbery counts. Petitioners Reigh and Physioc received the same sentence as Petitioner Henson except that Petitioner Reigh was sentenced to twenty years for each robbery count, to run concurrently and Petitioner Physioc was sentenced to sixty years for each count, to run concurrently.

[3]The remaining assigned errors will be discussed *infra* in the discussion section of this opinion in connection with the Petitioner(s) who raised the assigned error.

1

therefore, reverses the Petitioners' respective sentencing orders on this issue only and the cases are remanded to the circuit court for entry of new sentencing orders consistent with this opinion. For reasons set forth more fully below, we find no other reversible error in connection with the remainder of the assigned errors raised by the Petitioners and affirm the circuit court's rulings on those issues.

## I. Factual and Procedural History

The charges brought against the Petitioners stemmed from the brutal beating of Robert Basore ("Robert") and his two adult sons that occurred during a home invasion in which only property located in Robert's bedroom and belonging to him was taken from the home. According to the evidence offered at trial, about two weeks before the home invasion, in April of 2015, Sherry Basore,[4] who was Robert's granddaughter, Petitioner Henson, and Totianna Etheridge, who was Petitioner Henson's then-girlfriend, visited Robert's home so that Sherry could borrow $20 from her grandfather to buy drugs. Sherry told these individuals that her grandfather had $80,000 in his home from the sale of some land. Robert testified that only Petitioner Henson and Sherry came into his home on this visit. Robert stated that he had about $200 in his wallet and that he gave Sherry money in front of the Petitioner Henson.

---

[4]According to the record, Sherry entered a guilty plea to a misdemeanor charge of conspiracy to commit petit larceny in exchange for her testimony at trial.

Ms. Etheridge,[5] a key witness for the Respondent ("the State"), also testified that after the visit to Robert's home, Sherry told Ms. Etheridge and Petitioner Henson what her grandfather kept in his house. According to Ms. Etheridge, Sherry explained to Petitioner Henson where everything was located in Robert's home. Sherry also told Petitioner Henson that just her father and grandfather would be in the home. Sherry even suggested that they should go during the day because her father and grandfather "would be drunk and passed out." Sherry made such disclosures because she was "dope sick," or as Ms. Etheridge explained, Sherry was going through withdrawal from heroin and needed to get more drugs.

In the early evening on May 7, 2015, two masked men entered Robert's home, which was unlocked at the time. Both of Robert's sons were also at home when the invasion occurred. Robert was in the kitchen and his two sons were in the living room. The two intruders used some type of metal bar to beat all three men about their heads[6] to subdue them. One of the intruders demanded that Robert tell him where his safe was and Robert refused. Robert was then dragged into his bedroom, where the intruder told him to give him his wallet and took the wallet from Robert's back pocket. The intruders also took a toolbox from

[5]Ms. Etheridge testified that she entered into a plea agreement with the State in exchange for her trial testimony.

[6]Robert testified that he was beaten about the head; William, Robert's son, testified that he had fifty staples in the back of his head and neck due to being beaten by the intruders; and Michael, Robert's other son, testified that he received thirty-eight staples in his head and lost a lot of blood due to the beating he received.

Robert's bedroom containing "some silver, old antique money in it. Had some $2 bills . . . [and] I think my wife had a necklace and a bracelet. . . ." A .22 caliber rifle with a scope was also taken from Robert's bedroom. The intruders then left the house, taking no personal property from either of Robert's sons. Robert's son, Michael, testified that he had not been robbed and that the items that had been taken from his father's home were not taken in his presence. There were no fingerprints or DNA obtained from the home and the victims were unable to identify the perpetrators because of the masks.

Ms. Etheridge testified that around 3:00 to 3:30 a.m. the next morning, she received a phone call from Petitioner Henson while she was working at the Lust Nightclub. Petitioner Henson told her that "he needed some money to get out of town because they just hit a lick." Ms. Etheridge testified that "hitting a lick" refers to "something illegal like a home invasion or some sort like that." According to Ms. Etheridge, Petitioner Henson, Petitioner Reigh and Petitioner Physioc[7] arrived together "around back" of the nightclub in a large white pickup truck about thirty minutes later. Ms. Etheridge went "out back to give them the money and he just told me that they hit a lick and they needed to get out of town and they didn't get anything because . . . [Petitioner Physioc] fucked it up." When asked by the prosecutor how that happened, Ms. Etheridge stated that "[Petitioner Physioc] . . . grabbed

[7]According to Ms. Etheridge, Petitioners Reigh and Physioc were in a relationship at the time of the crime.

4

the wrong safe." Ms. Etheridge did not testify that either Petitioner Reigh or Petitioner Physioc made any statements to her when Petitioner Henson was telling her what had occurred nor did they attempt to leave the vehicle. The Petitioners took the money from Ms. Etheridge and left.

Ms. Etheridge stated that she did not see Petitioner Henson again until the next morning. She and Petitioner Henson were living together at the Motel 6 in Hagerstown, Maryland. Ms. Etheridge testified that Petitioner Henson told her "[t]hat he tried everything he could to get the safe from the guy, but they had to beat him to be able to get anything" and that he had assistance in committing the crime. Ms. Etheridge then stated that Petitioner Henson told her that there were three victims, "the grandfather and the father and the uncle," and that it was "Sherry Basore's family."

Ms. Etheridge also testified that Petitioner Physioc had shown her "older, ancient like coins" that he had from the crime and that he had asked her if she knew where he could sell them. Ms. Etheridge also observed some of the stolen coins in Petitioner Reigh's handbag. According to Ms. Etheridge, "[Petitioner Physioc] . . . and [Petitioner Henson] had went out somewhere, me and her [Petitioner Reigh] was actually going to shoplift and she was emptying her purse and a couple of the coins fell out of her purse." The stolen items were not found or offered into evidence.

5

None of the Petitioners testified at trial. At the conclusion of all the evidence, the jury returned a verdict of guilt as to all the charges against the Petitioners. The circuit court sentenced the Petitioners and this appeal ensued.

## II. Standard of Review

The Petitioners have asserted various assignments of error, which require this Court to apply different standards of review as we examine each issue raised. The Court, therefore, sets forth each standard of review within the discussion section of each issue.

## III. Discussion

### a. Double Jeopardy

The first issue requires the Court to decide whether the Petitioners were properly indicted, tried and convicted of three counts of first degree robbery[8] instead of one count. The Petitioners first challenged the indictment[9] arguing that two of the three robbery counts should be dismissed[10] based upon their argument that the Double Jeopardy Clause as

_____

[8] *See* W. Va. Code § 61-2-12(a) (2014).

[9] The State amended the indictment in an attempt to ameliorate the Petitioners' challenges to the robbery counts. Given our holding on this issue, we find it unnecessary to specifically address the language in the indictment or the amended indictment.

[10] The Petitioners also sought the dismissal of two of the assault during the commission of a felony counts. The circuit court properly denied the Petitioners' motion on this issue. Petitioner Physioc, however, argues on appeal that if there is no robbery of William or

(continued...)

6

set forth in article III, section 5 of the West Virginia Constitution would be violated, as well as decisions issued by this Court,[11] if they were convicted for multiple counts of first degree robbery. Conversely, the State contended that the three robbery counts were proper because there was a taking of property "from the presence of three distinct residents of a dwelling house." The circuit court agreed with the State and found that charging, and ultimately convicting, the Petitioners with multiple counts of robbery was proper because "while the $250 in cash, toolbox, and coins, technically belonged to Robert Basore, these items were also in the *presence* of Michael and William Basore because they were taken from their home."

_____

[10](...continued)
Michael, "no malicious assault can then flow during the commission of that alleged felony as charged in Courts 6 [robbery of William] and 7 [robbery of Michael] of the Indictment." But this argument is unsupported by our law. West Virginia Code § 61-2-10 (2014) provides that "[i]f any person in the commission of, or attempt to commit a felony, unlawfully . . . wound another person, he shall be guilty of a felony . . . ." Based upon the express terms of the statute, the evidence supported three counts of assault during the commission of a felony as all three residents of the home were intentionally injured during the commission of a robbery. *See State v. Penwell*, 199 W. Va. 111, 116, 483 S.E.2d 240, 245 (1996) ("[W]e conclude that by enacting the offense of assault during the commission of a felony, the legislature clearly intended to impose punishment in addition to that specified for the underlying felony, if the criminal actor shot, cut, stabbed, or wounded another person during the attempt to commit or the commission of the underlying felony and to classify that additional conduct as felonious. In short, W. Va. Code § 61-2-10 acts as an enhancement statute where conduct otherwise defined as felonious is executed in such a manner that another person–a victim of the underlying felony or a witness or other bystander–is shot, cut, stabbed, or wounded in the process.").

[11]*See State v. Myers*, 229 W. Va. 238, 728 S.E.2d 122 (2012); *State v. Collins*, 174 W. Va. 767, 329 S.E.2d 839 (1984).

This Court's review of "a double jeopardy claim [is] . . . *de novo*." Syl. Pt. 1, in part, *State v. Sears*, 196 W. Va. 71, 468 S.E.2d 324 (1996).[12] Utilizing a de novo review standard, we address whether the proper unit of prosecution was applied in this case.

"The purpose of the Double Jeopardy Clause is to ensure that sentencing courts do not exceed, by the device of multiple punishments, the limits prescribed by the legislative branch of government, in which lies the substantive power to define crimes and prescribe punishments." *Id.* at 73, 468 S.E.2d at 326, Syl. Pt. 3. Further, "[t]he analysis of whether a criminal defendant may be separately convicted and punished for multiple violations of a single statutory provision turns upon the legislatively-intended unit of prosecution." Syl. Pt. 4, *State v. Goins*, 231 W. Va. 617, 748 S.E.2d 813 (2013).

The Court begins by reviewing the relevant part of our robbery statute set forth in West Virginia Code § 61-2-12(a) as follows:

> Any person who commits or attempts to commit robbery by: (1) Committing violence to the person, including, but not limited to, partial strangulation or suffocation or by striking or beating; or (2) uses the threat of deadly force by the presenting of a firearm or other deadly weapon, is guilty of robbery in the first degree and, upon conviction thereof, shall be imprisoned in a state correctional facility not less than ten years.

---

[12]*Accord* Syl. Pt. 1, *State v. McGilton*, 229 W. Va. 554, 729 S.E.2d 876 (2012); *see also* Syl. Pt. 1, *State v. Grimes*, 226 W. Va. 411, 701 S.E.2d 449 (2009) (holding that review of denial of motion to dismiss an indictment is de novo).

We have previously examined this statute and recognized it "does not actually define robbery." *State v. Wilkerson*, 230 W. Va. 366, 371, 738 S.E.2d 32, 37 (2013) (citing *State v. Harless*, 168 W. Va. 707, 710, 285 S.E.2d 461, 464 (1981); *State ex rel. Vandal v. Adams*, 145 W. Va. 566, 569, 115 S.E.2d 489, 490 (1960)). "Rather, 'the elements of robbery, unaffected by the statute, are derived from the common law[.]' *State v. England*, 180 W. Va. 342, 347, 376 S.E.2d 548, 553 (1988)." *Wilkerson*, 230 W. Va. at 371, 738 S.E.2d at 37. Thus, under the common law, the elements of the robbery included the elements of larceny as follows: "'At common law, the definition of robbery was (1) the unlawful taking and carrying away, (2) of money or goods, (3) from the person of another or in his presence, (4) by force or putting him in fear, (5) with intent to steal the money or goods.' Syllabus Point 1, *State v. Harless*, 168 W. Va. 707, 285 S.E.2d 461 (1981)." Syl. Pt. 3, *State v. Neider*, 170 W. Va. 662, 295 S.E.2d 902 (1982). We found in *Neider* that "[i]t is clear that robbery at common law encompassed the same elements as a larceny and included two additional elements: the taking has to be from the person of another or in his presence and such taking has to be by force or putting the person in fear." *Id.* at 667, 295 S.E.2d at 907.

This Court first addressed the unit of prosecution for robbery in *State v. Collins*, 174 W. Va. 767, 329 S.E.2d 839 (1984). In *Collins*, the defendant was convicted of two counts of attempted aggravated robbery. Two men, wearing ski masks, entered a convenience store. One of the store clerks was ordered onto the floor at gunpoint, while the

9

other clerk was shot as she came out of the back stockroom. No property was taken from the store. The defendant, one of the masked men involved in the attempted robbery, argued that only one count of attempted aggravated robbery could be charged because the property sought to be taken belonged to only one owner, the convenience store. *Id*. at 768, 329 S.E.2d at 840.

> After examining the law in other jurisdictions, the Court stated:
>
> We have examined cases from other jurisdictions involving the robbery of stores or banks where more than one clerk or employee was present. It is sometimes argued that since each clerk or employee, through his employment, exercises constructive possession over his employer's property, a separate robbery conviction can be established for each employee present in the store or bank during a robbery. However, this theory has been rejected by most of the courts addressing the issue. *The rationale commonly advanced by these courts is that because the property taken is owned by only one entity, i.e., the store or bank, there is only one larceny and, therefore, only one robbery.*

*Id*. at 772, 329 S.E.2d at 844 (emphasis added). We held in *Collins* that "[i]t is impossible to conclude from either the common law or W. Va. Code, 61-2-12, that an attempt to rob a store by presenting a firearm and leaving without taking any property can, in light of double jeopardy principles, result in multiple convictions of attempted aggravated robbery for each clerk present in such store." 174 W. Va. at 768, 329 S.E.2d at 840, Syl. Pt. 2. But we expressly limited the application of *Collins* in the holding to attempted robbery. *Id*.

10

Following *Collins*, in *State ex rel. Lehman v. Strickler*, 174 W. Va. 809, 329 S.E.2d 882 (1985), the Court was again asked whether the taking of property from two separate victims at the same time could be charged as one count of aggravated robbery or two. We upheld the petitioner's conviction for two counts, stating:

> Recently in Syllabus Point 2 of *State v. Collins*, W. Va., 329 S.E.2d 839 (1984), we held that "an attempt to rob a store by presenting a firearm and leaving without taking any property can[not], in light of double jeopardy principles, result in multiple convictions of attempted aggravated robbery for each clerk present in such store." In the course of that opinion, we were careful not to foreclose the possibility of multiple punishments where there *were several completed robberies, and the property taken belonged to several different victims, instead of a single entity such as a bank or store*.

174 W. Va. at 811, 329 S.E.2d at 884 (emphasis added).

More recently in *State v. Myers*, 229 W. Va. 238, 728 S.E.2d 122 (2012), this Court again was presented with the question of how many counts were properly charged where two store clerks and two employees of a cleaning company were present when the petitioner robbed a convenience store. *Id.* at 248-49, 728 S.E.2d at 132-33. The petitioner entered the store carrying a firearm. *Id.* at 242, 728 S.E.2d at 127. There were four people in the store at the time the petitioner entered. *Id.* One of the store employees was instructed to empty the cash register, while the two cleaning company employees were ordered to empty their pockets. The other store employee was in the office and remained hidden during the crime. *Id.* The petitioner was indicted and convicted on three counts of first degree robbery.

11

*Id.* at 243-44, 728 S.E.2d at 127-28.  Upon appeal, this Court upheld the conviction on three counts of robbery, determining that

> The *facts* of the petitioner's case *establish that he robbed the One Stop store through its employee, Ms. Bess, who was the store manager*.  He then individually robbed Mr. Price and then Mr. Torres.  Both men were ordered at gunpoint to the floor and both men were instructed to empty their pockets.  *The evidence showed that the petitioner then took their individual personal property and fled the premises*.  Given these facts, this Court finds no double jeopardy violation.  Consequently, the circuit court did not commit error in charging, trying, and convicting the petitioner of three counts of robbery.

*Id.* at 249-50, 728 S.E.2d at 133-34 (emphasis added).

Turning to the instant case, the undisputed testimony from the victims was that the property taken belonged solely to Robert and was taken from him while he was in his bedroom.  One of Robert's sons, Michael, testified that he had not been robbed, because nothing had been taken from him and nothing was taken in his presence.  Also, the same son testified that he never went into his father's bedroom.  Applying the law set for in *Collins* and *Myers* to the facts of this case,[13] in order for multiple punishments to be imposed for multiple

---

[13]The State attempts to distinguish both *Collins* and *Myers* by arguing that

> [t]he elements of robbery require proof of a taking of property "from the person of another or in his presence."  At best, these elements require only that the person from whose person or presence the property is taken have a greater possessory right than the offender doing the taking.  The ordinary resident or

(continued...)

counts of robbery, the State must show that the property taken belongs to different victims. *Myers*, 229 W. Va. at 249-50, 728 S.E.2d at 133-34. In this case, the State only established that one of the victims had property taken and, therefore, the Petitioners should have been charged (and convicted) of only one count of first degree robbery. Therefore, we reverse two of each of the Petitioners' convictions for first degree robbery, finding that under the facts of this case they should have been tried (and convicted) for only one count of first degree robbery; we remand this case to the circuit court for entry of new sentencing orders that comport with this decision.

## b. Statement of Co-conspirator

Petitioners Physioc and Reigh argue that the trial court erred in admitting the testimony of Totianna Etheridge.[14] Collectively, Petitioners Physioc and Reigh argue that 1) the testimony was improperly admitted under the guise of the co-conspirator exception to

---

[13](...continued)
> occupant of a dwelling house will always have a greater possessory right to the home's contents than an intruder.

But the problem with the State's position is that it offered no legal authority to support it before the trial court, nor on appeal. Consequently, we do not address the issue of whether a person's possessory right to property fulfills the element of robbery that property must be taken "from the person of another or in his presence." *Neider*, 170 W. Va. at 667, 295 S.E.2d at 907.

[14]Petitioner Henson's statements made to Ms. Etheridge about his participation in the crimes committed in this case were properly admitted against Petitioner Henson under the statement against interest exception to hearsay set forth in West Virginia Rule of Evidence 804(b)(3).

hearsay;[15] and 2) the testimony violated the Confrontation Clause.[16] The State argues that the admission of the testimony was proper under West Virginia Rule of Evidence 801(d)(2)(E) as the testimony at issue concerned a statement of a co-conspirator of the party against whom the evidence was offered and the statement was made in furtherance of the conspiracy.

Our review of the circuit court's decision to admit evidence is set forth in syllabus point ten of *State v. Huffman*, 141 W. Va. 55, 87 S.E.2d 541 (1955), *overruled on other grounds by State ex rel. R.L. v. Bedell*, 192 W. Va. 435, 452 S.E.2d 893 (1994), as

---

[15]The only objection raised before the trial court regarding Ms. Etheridge's statement was the statement was made after the conspiracy was complete and, therefore, is inadmissible under Rule 801(d)(2)(E). There was also a comment made before the trial court about the statement violating the Confrontation Clause.

[16]Petitioner Reigh argues that the admission of Ms. Etheridge's testimony included improper "bad acts" evidence purposefully admitted in evidence by the State in violation of West Virginia Rule of Evidence 404(b) and the law set forth in *State v. McGinnis*, 193 W. Va. 147, 455 S.E.2d 516 (1994), for examining the admissibility of such evidence. Petitioner Reigh's argument is unsupported by the record. The "bad acts" evidence referred to was that Ms. Etheridge testified that she and Petitioner Reigh were going shoplifting when Ms. Etheridge noticed the old coins in Petitioner Reigh's purse. It appears from our review of the transcript below that the mention of going shoplifting was inadvertent and not intentionally sought by the State. Further, Petitioner Reigh did not raise a Rule 404(b) objection before the circuit court, nor did she request any limiting instruction regarding the Rule 404(b) evidence. Finally, Petitioner Reigh's counsel proceeded to ask Ms. Etheridge several questions about the alleged shoplifting during cross-examination. Consequently, we agree with the State that Petitioner Reigh's claimed error is waived due to her failure to properly object before the circuit court. *See State v. Degraw*, 196 W. Va. 261, 272, 470 S.E.2d 215, 226 (1996) (finding that defendant's failure to raise a Rule 404(b) objection before trial court precluded review by this Court and that plain error analysis not triggered). We also decline to invoke the plain error doctrine regarding this alleged error as we have previously held that "the plain error rule should be exercised only to avoid a miscarriage of justice." Syl. Pt. 7, in part, *State v. LaRock*, 196 W. Va. 294, 470 S.E.2d 613 (1996).

14

follows: "The action of a trial court in admitting or excluding evidence in the exercise of its discretion will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion." We now undertake an examination of whether the circuit court abused its discretion in admitting Petitioner Henson's statements to Ms. Etheridge.

West Virginia Rule of Evidence 801(d)(2)(E) provides that: "A statement that meets the following conditions is not hearsay . . . [t]he statement is offered against an opposing party and . . . was made by the party's coconspirator during and in furtherance of the conspiracy." Further, in syllabus point three of *State v. Helmick*, 201 W. Va. 163, 495 S.E.2d 262 (1997), we held that "[u]nder Rule 801(d)(2)(E) of the West Virginia Rules of Evidence, a declaration of a conspirator, made subsequent to the actual commission of the crime, may be admissible against any co-conspirator if it was made while the conspirators were still concerned with the concealment of their criminal conduct or their identity."

Petitioners Physioc and Reigh focus upon Ms. Etheridge's testimony that Petitioner Henson, her then-boyfriend, told her in the presence of Petitioners Physioc and Reigh that "he just told me that they hit a lick and they needed to get out of town and they didn't get anything because . . . [Petitioner Physioc] fucked it up." The statements made by Petitioner Henson to Ms. Etheridge were properly admitted by the circuit court as statements of a co-conspirator. *See id.* Specifically, this statement certainly demonstrates the Petitioners

15

needed financial assistance in an attempt to avoid detection by law enforcement for the heinous felonies that they had committed.[17]  There is no question that this statement was made in furtherance of the conspiracy as the statement "was made while the conspirators were still concerned with the concealment of their criminal conduct or their identity." *Helmick*, 201 W. Va. at 165, 495 S.E.2d at 264, Syl. Pt. 3, in part.

Additionally, we find no merit to the argument that the statement focused upon by Petitioners Physioc and Reigh, or other similar statements that Ms. Etheridge testified to, violated their Confrontation Clause rights.[18]  The Confrontation Clause only "bars the admission of a *testimonial statement by a witness* who does not appear at trial, unless the witness is unavailable to testify and the accused had a prior opportunity to cross-examine the witness." Syl. Pt. 6, in part, *State v. Mechling*, 219 W. Va. 366, 633 S.E.2d 311 (2006) (emphasis added).  Further, "[u]nder the Confrontation Clause, . . . a testimonial statement is, generally, a statement that is made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."

---

[17]Further, Petitioners Physioc and Reigh arguably adopted the statement by remaining silent or not taking action at the time the statement was made.  *See* Syl. Pt. 3, *State v. Browning*, 199 W. Va. 417, 485 S.E.2d 1 (1997) ("When a party adopts a statement by silence, in order to be admissible, the statement does not have to be accusatory or against the party's interest at the time it was made, but one that would naturally call for a reply if the truth of the statement was not intended to be admitted.").

[18]*See* U.S. Const. amend. VI; W. Va. Const. art. III, § 14; *see also Crawford v. Washington*, 541 U.S. 36 (2004).

16

*Id.* at 368, 633 S.E.2d at 313, Syl. Pt 8, in part. But the statements in the instant case were not testimonial in nature or made as part of a criminal investigation; instead the statements at issue were made by a boyfriend to his girlfriend in front of acquaintances. As the United States Court of Appeals for the Fourth Circuit stated in *United States. v. Jordan*, 509 F.3d 191 (4th Cir. 2007),

> [t]o our knowledge, no court has extended *Crawford* to statements made by a declarant to friends or associates. *See United States v. Franklin*, 415 F.3d 537, 545 (6th Cir. 2005) (concluding that statements were non-testimonial where witness "was privy to [Declarant]'s statements only as his friend and confidant"); *United States v. Saget*, 377 F.3d 223, 229 (2d Cir. 2004) ("Thus, we conclude that a declarant's statements to a confidential informant, whose true status is unknown to the declarant, do not constitute testimony within the meaning of *Crawford.*"); *United States v. Manfre*, 368 F.3d 832, 838 n.1 (8th Cir. 2004) ("[Declarant]'s comments were made to loved ones or acquaintances and are not the kind of memorialized, judicial-process-created evidence of which *Crawford* speaks.").

*Jordan*, 509 F.3d at 201. Based upon our review of the statements at issue, there is no implication of the Confrontation Clause as the statements made to friends or acquaintances were non-testimonial as the statements "would [not] lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Mechling*, 219 W. Va. at 368, 633 S.E.2d at 313, Syl. Pt 8, in part.

### c. Sufficiency of the Evidence

The Petitioners also argue that there was insufficient evidence introduced against them to support their respective convictions. In a general fashion, the Petitioners

17

collectively argue that there was no eyewitness identification of the perpetrators involved in the crimes and there was no forensic evidence linking any of them to the crimes charged. Further, the Petitioners attack the State's heavy reliance upon the testimony of Totianna Etheridge,[19] who allegedly was "an admitted deceiver[,]"[20] which is claimed to make the State's case tenuous. Conversely, the State argues that the Petitioners focus not on the evidence that was actually offered against them, but on evidence that was not offered. When the evidence the State offered against the Petitioners is reviewed, the State maintains that sufficient evidence was presented to the jury to uphold the convictions. We agree with the State's position.

The Court's review of a challenge to the sufficiency of the evidence is set forth in syllabus point one of *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995):

---

[19]Petitioner Reigh argues that even Ms. Etheridge's testimony as to her participation in the crime was recognized by the State to be "slight." In fact, Petitioner Reigh argues that there was no testimony that she was the driver that night of the crimes and the victims only testified to two assailants, not three. While the State did make a statement about the evidence against Petitioner Reigh being "slight," Petitioner Reigh omitted the remainder of the State's argument on the issue, wherein the State stated: "However, I do think it is sufficient to put it to a jury. I think there's sufficient circumstantial evidence to demonstrate that she was a principal in the second degree, an aider and better acting in concerted action with her co-defendants."

[20]Ms. Etheridge was subject to rigorous cross-examination directed at impeaching her credibility including being questioned about her drug usage, her criminal acts, her making a prior false statement against Petitioner Henson, and her plea agreement in exchange for her testimony.

18

[t]he function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

Furthermore,

[a] criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled.

*Id.* at 663, 461 S.E.2d at 169, Syl. Pt. 3. We also have held that

[w]hen a criminal defendant undertakes a sufficiency challenge, all the evidence, direct and circumstantial, must be viewed from the prosecutor's coign of vantage, and the viewer must accept all reasonable inferences from it that are consistent with the verdict. This rule requires the trial court judge to resolve all evidentiary conflicts and credibility questions in the prosecution's favor; moreover, as among competing inferences of which two or more are plausible, the judge must choose the inference that best fits the prosecution's theory of guilt.

19

*LaRock*, 196 W. Va. at 299, 470 S.E.2d at 618, Syl. Pt. 2. The Court now undertakes a review of the Petitioners' challenges that the evidence was insufficient to convict them.

The Petitioners carry a heavy burden in their challenges to the sufficiency of the evidence used to convict them. Contrary to the Petitioners' position that the evidence was insufficient because there was no eyewitness identification of them and no forensic evidence that incriminated them, this type of evidence is simply not required to prove the elements of any crime. Rather, in reviewing the sufficiency of the evidence challenges, we are required to examine the evidence that was actually offered during the trial.

In this case, the State established that a week or two before the commission of the crimes charged, Petitioner Henson, Sherry Basore, and Ms. Etheridge went to the Basore home. Sherry wanted to borrow money from her grandfather to purchase drugs. Petitioner Henson went into the home with Sherry and saw the large number of bills that her grandfather kept in his wallet. Sherry also told Petitioner Henson and Ms. Etheridge that her grandfather had $80,000 in his house from the sale of property. During a period when Sherry was "dope sick" prior to the crimes being committed, she gave Petitioner Henson information about her grandfather's home and told him he should take the safe. The State offered the testimony of the three victims that on the evening of the crimes, two attackers entered their home and beat each of them with a metal bar. There was no evidence regarding how the

20

Petitioners arrived at the Basore home; however, the State argued based upon the circumstantial evidence that Petitioner Reigh did not enter the Basore home, but was waiting in a vehicle near the home to assist in picking up the stolen goods and Petitioner Henson and Physioc upon leaving the home. The intruders were looking for a safe and dragged the father, Robert, into his bedroom. The intruders took Robert's wallet containing approximately $200 in cash from him, as well as a toolbox containing old coins and a .22 caliber rifle from Robert's bedroom. In the early morning hours after the crimes were committed, Petitioner Henson called his girlfriend, Ms. Etheridge, and told her that "they just hit a lick," meaning that they had committed a crime and "needed to get out of town." The Petitioners, altogether in a pickup truck, then met Ms. Etheridge at her workplace where Petitioner Henson again said in front of Ms. Etheridge, Petitioner Reigh and Petitioner Physioc "that they hit a lick and needed to get out of town and they didn't get anything because . . . [Petitioner Physioc] fucked it up," by taking the wrong safe. The following day, Petitioner Henson told Ms. Etheridge that "he tried everything he could to get the safe from the guy, but they had to beat him to be able to get anything." Further, Petitioner Henson told Ms. Etheridge that there were three victims. Several days later, Ms. Etheridge testified that Petitioner Physioc had shown her the old coins that were stolen and asked if she knew where they could be sold. Ms. Etheridge also testified to seeing Petitioner Reigh in possession of the old coins. There was also testimony from a deputy that when Ms. Etheridge told the police about what she had learned, she knew many of the details about the crimes that were

21

not known generally like the amount of money taken from the wallet and the toolbox being stolen.

Based upon our review, we find that when all the evidence offered against the Petitioners is viewed in the light most favorable to the State, and when all inferences and credibility determinations are also viewed in the light most favorable to the State, there was sufficient evidence to sustain the Petitioners' respective convictions in this case beyond a reasonable doubt. *See LaRock*, 196 W. Va. at 299, 470 S.E.2d at 618, Syl. Pt. 2.

### d. Failure to Preserve the Gun Scope

Petitioners Henson and Physioc also argue that the circuit court erred in failing to instruct the jury as to the State's failure to preserve potential exculpatory evidence.[21] This argument is predicated upon Petitioner Henson's position that the State had a duty to conduct both fingerprint and DNA testing on the gun scope found at the crime scene and to preserve it for inspection by the defense. Petitioner Physioc argues that if the gun scope had been preserved by the State, it "could have been subjected to DNA testing which would have excluded him as a suspect in the robbery and the assaults."

---

[21]Petitioners Henson and Physioc apparently sought an adverse inference instruction regarding the missing evidence. *See State v. Osakalum*, 194 W. Va. 758, 461 S.E.2d 504 (1995). But neither Petitioner provided the Court with a copy of this proposed instruction.

22

This assigned error arises from the gun scope found by law enforcement in the driveway outside the Basore home during the investigation of the crimes. Deputy Michael St. Clair, then employed by the Berkeley County Sheriff's Department, testified that the scope was damaged when it was found, but it was determined that the scope fell off the .22 caliber rifle that was taken from the home. Deputy St. Clair also testified that the scope was sent to the lab to ascertain whether it had fingerprints on it. The deputy testified that in trying to identify fingerprints on the scope, he "fumed" the scope, which is a process that involves placing the scope in an enclosure with a heating element and a container of a Super Glue-type material. The material is then heated and observed for whether it attached to moisture associated with fingerprints. There was nothing evidentiary in value or incriminating against Petitioners Henson and Physioc obtained from this process. After finding no fingerprints, the deputy testified that he discarded the scope, because the scope had been damaged, there were no fingerprints on it, and he did not believe that DNA testing could have been performed after the fuming process as that process would have coated any DNA that may have been present on the scope. Based upon Deputy St. Clair's testimony, Petitioners Henson and Physioc requested that the jury be instructed in accordance with *State v. Osakalumi*, 194 W. Va. 758, 461 S.E.2d 504 (1995). But the trial court determined that it would be "unfair to . . . draw attention to something not supported by the evidence and the issues in the case and this Court does not believe the scope is one of the central material

23

issues in the case as the sofa was in *Osakalumi*." We agree with the trial court's decision on this issue.

"As a general rule, the refusal to give a requested jury instruction is reviewed for an abuse of discretion. By contrast, the question of whether a jury was properly instructed is a question of law, and the review is *de novo*." Syl. Pt. 1, *State v. Hinkle*, 200 W. Va. 280, 489 S.E.2d 257 (1996). Further, "'[a] trial court's instructions to the jury must be a correct statement of the law and supported by the evidence.'" Syl. Pt. 12, in part, *State v. Surbaugh*, 237 W. Va. 242, 786 S.E.2d 601 (2016) (quoting, Syl. Pt. 4, in part, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995)). "Instructions must be based upon the evidence and an instruction which is not supported by evidence should not be given." Syl. Pt. 4, *State v. Collins*, 154 W. Va. 771, 180 S.E.2d 54 (1971). Finally, as we held in syllabus point thirteen of *Surbaugh*,

> "A trial court's refusal to give a requested instruction is reversible error only if: (1) the instruction is a correct statement of the law; (2) it is not substantially covered in the charge actually given to the jury; and (3) it concerns an important point in the trial so that the failure to give it seriously impairs a defendant's ability to effectively present a given defense." Syl. Pt. 11, *State v. Derr*, 192 W.Va. 165, 451 S.E.2d 731 (1994).

237 W. Va. at 247, 786 S.E.2d at 607.

24

We enunciated the law necessary to resolve this issue in *Osakalumi*,

> [w]hen the State had or should have had evidence requested by a criminal defendant but the evidence no longer exists when the defendant seeks its production, a trial court must determine (1) whether the requested material, if in the possession of the State at the time of the defendant's request for it, would have been subject to disclosure under either West Virginia Rule of Criminal Procedure 16 or case law; (2) whether the State had a duty to preserve the material; and (3) if the State did have a duty to preserve the material, whether the duty was breached and what consequences should flow from the breach. In determining what consequences should flow from the State's breach of its duty to preserve evidence, a trial court should consider (1) the degree of negligence or bad faith involved; (2) the importance of the missing evidence considering the probative value and reliability of secondary or substitute evidence that remains available; and (3) the sufficiency of the other evidence produced at the trial to sustain the conviction.

194 W. Va. at 759, 461 S.E.2d at 505, Syl. Pt. 2.

Applying the holding of *Osakalumi* to the case sub judice, the State concedes that the gun scope was discoverable and "potentially could have been kept and maintained." *See id.* Thus, in determining the consequences that should flow from the State's handling of the gun scope, the trial court considered the evidence offered by the deputy who destroyed the scope after it was fumed. The officer discarded the scope because it was damaged and, after fuming it, he believed that it had no evidentiary value. There was no finding by the circuit court that the officer acted in bad faith, as the evidence does not support such finding. Further, the missing gun scope offered little, in any, probative value as the officer testified

25

that the fuming of the scope in his examination of it for fingerprints would have destroyed any DNA that might have been on it. Finally, the gun scope was not needed to convict the Petitioners as it offered no real evidentiary value other than it was found outside the Basore home and was attached to the .22 rifle that was stolen. Instead, the primary evidence against Petitioners was the testimony of Ms. Etheridge and the scope was not needed to convict Petitioners.[22] Given that the lack of any evidentiary value that the gun scope offered, the trial court did not err in refusing to instruct the jury concerning adverse inferences that it could draw from the deputy's decision to discard the gun scope. *Id.*

---

[22]We have reviewed the remaining assigned errors, which include 1) Petitioner Reigh's claim that the circuit court held proceedings at critical stages of her case without her being present in violation of her constitutional right to be present when the circuit court conducted a pretrial hearing with her counsel present and the only decision made at the hearing was the circuit court's dismissal of the attempted murder charge as to all the Petitioners; 2) Petitioner Henson's claims that the circuit court erred by not excluding gruesome photographs of the victims and the crime scene and that the circuit court erred by not granting his motion to disqualify the Berkeley County assistant prosecutor over remarks the assistant prosecutor made to a local newspaper regarding why the State had entered into a plea agreement with Sherry Basore; and 3) Petitioner Physioc's claim that cumulative error requires reversal of his conviction. Upon close examination of the alleged errors raised in connection with the applicable law, we find the circuit court did not err in its rulings made regarding the foregoing assigned errors. As to Petitioner Physioc's assigned error that he was denied effective assistance of counsel, this Court has previously held in syllabus point ten of *State v. Hutchinson*, 215 W. Va. 313, 599 S.E.2d 736 (2004) (quoting Syl. Pt. 10, *State v. Triplett*, 187 W. Va. 760, 421, S.E.2d 511 (1992)), this issue is more appropriately raised in a habeas corpus proceeding where the record can be more fully developed and "'[i]t is the extremely rare case when this Court will find ineffective assistance of counsel . . .'" on direct appeal.

26

## IV. Conclusion

For the foregoing reasons, the respective convictions and sentencing orders of Petitioners Ryan L. Henson, Kerri S. Reigh and Jonathan W. Physioc are reversed with respect only to the first degree robbery convictions and sentences and the cases are remanded to the circuit court for entry of new sentencing orders for each of the Petitioners consistent with this opinion. The remainder of the convictions and sentences for each of the Petitioners are hereby affirmed.

Reversed, in part, and remanded with instructions;
Affirmed, in part.